HERBSTMAN *v.* SHIFTAN.

1. PARENT AND CHILD—CUSTODY OF CHILDREN.
    Parents, whether rich or poor, have the natural and statutory right to the custody of their children and should not be deprived thereof without extremely good cause (CLS 1956, § 703.6).

REFERENCES FOR POINTS IN HEADNOTES
[1] 39 Am Jur, Parent and Child § 20.
[2] 39 Am Jur, Parent and Child §§ 26, 27.
[3] 39 Am Jur, Parent and Child § 10.
[4] 39 Am Jur, Parent and Child § 21; 25 Am Jur, Habeas Corpus § 80.
[5] 39 Am Jur, Parent and Child §§ 23, 49.

2. SAME—CUSTODIAN'S VIOLATION OF CHILD'S RIGHTS.

The violation by parents of a child's rights, which include proper and necessary support; education as required by law; medical, surgical, and other care necessary for his health, morals, or well-being; the right to proper custody by parents, guardian, or other custodian; and right to live in a suitable place free from neglect, cruelty, drunkenness, criminality, or depravity on the part of such custodian, may subject the child to judicial control and forfeit the right to the child's custody, control, and upbringing, when the safety and best interests of the child demand it (CLS 1956, § 703.6).

3. SAME—GUARDIANS.

The law makes the father the guardian of his daughter by nature and for nurture and prima facie entitled to her care and custody.

4. SAME—CHOICE OF YOUNG CHILD.

The choice of a 4-year-old daughter cannot be considered by the Supreme Court in its determination of what disposition shall be made of her custody on appeal in habeas corpus proceeding brought by nonresident father after he had remarried and established a home for his motherless child who had been cared for by defendants, her maternal uncle and his wife.

5. SAME—CUSTODY OF CHILD—FITNESS OF FATHER AS PARENT.

Nonresident father who lodged his 1-1/2-year-old daughter with her maternal uncle and his wife after the child's mother had died, and who now, some 3 years later, is employed, has remarried, and has established a proper home in New York City *held,* entitled to child's custody in the absence of a showing that he is not a suitable person to have custody of his daughter (CLS 1956, § 703.6).

BLACK, J., dissenting.

Appeal from Jackson; Falahee (Charles J.), J. Submitted January 3, 1961. (Calendar No. 48,599.) Decided April 26, 1961. Rehearing denied June 7, 1961.

Habeas corpus by Mayer Herbstman to recover custody of his daughter Chana (Hanna) Rachel Herbstman from Erwin Shiftan and Bernice Shiftan. Writ dismissed. Plaintiff appeals. Reversed and remanded for entry of order granting petition and awarding father custody.

*Thomas L. Poindexter,* for plaintiff.

*Felix F. Best* and *Kevin J. Daly,* for defendants.

Kavanagh, J. This is an appeal by certiorari on leave granted from a circuit court order denying a father's petition for writ of habeas corpus to recover custody of his daughter, Hanna Herbstman, who, at the time of the filing of the petition in August, 1959, was 4 years old.

A hearing was held on the petition in the Jackson county circuit court. Testimony disclosed that Herbstman's wife died at Hanna's birth in Israel in 1954. Herbstman and his wife were refugees from Nazi Europe to Israel. After his wife's death, Mr. Herbstman, having no one to look after Hanna, placed her in a children's home in Israel.

In June, 1956, at the invitation of defendants Erwin Shiftan, Hanna's maternal uncle, and wife Bernice, Herbstman came to the United States bringing his 2 children—Hanna, 1-1/2 years old, and Ludwig, age 8. The 3 came to the Shiftan home in Jackson, Michigan. Appellant was a tailor by trade and found employment in a clothing store in Jackson for a short period of time. He then went to New York City, where his brother resided, and found employment there. He left Hanna with the defendants, but took his little boy with him to New York. On January 25, 1958, he married his present wife, and after establishing a home he informed defendants he desired to take Hanna to New York. Appellant was first asked to let Hanna stay with the Shiftans until Mr. Shiftan completed a trip to Europe in the summer of 1958. Later, they asked he extend this time until after Christmas. Numerous attempts were made by petitioner to obtain his child. The Shiftans expressed verbal willingness that Hanna should return to her father, but it appears from

the record they had become very attached to her and could not give her up.

The trial judge found there was no agreement for adoption or permanent custody of Hanna; that instead she was to remain with her aunt and uncle only temporarily and until her father could establish a home. The trial court further found as a fact that appellant appears to be a good man; that the home in New York City, as far as size, seems to be adequate; and that the testimony showed the ages of appellant and his wife and appellant's earnings and residence were at least equally favorable for raising Hanna as those of the Shiftans. The court further found he was not convinced the best interests of the child would be served by giving the father custody. He based his finding upon the following facts: The Shiftans have raised the child well without help from the father; the father made only 3 visits to see his child in 3-1/2 years; the child's love for her present home and the Shiftans' love for the child; the character and reputation of the present Mrs. Herbstman are unknown; taking the child from her present home and placing her in congested New York City would not be for the best interest of the child; the suggested drugging of the child on one occasion showed an inhuman attitude.

It is a well-established principle of law that the parents, whether rich or poor, have the natural right to the custody of their children. The rights of parents are entitled to great consideration, and the court should not deprive them of custody of their children without extremely good cause. A child also has rights, which include the right to proper and necessary support; education as required by law; medical, surgical, and other care necessary for his health, morals, or well-being; the right to proper custody by his parents, guardian, or other custodian; and the right to live in a suitable place free from

neglect, cruelty, drunkenness, criminality, or depravity on the part of his parents, guardian, or other custodian. It is only when these rights of the child are violated by the parents themselves that the child becomes subject to judicial control. A parent having violated the rights of a child forfeits his right to the custody, control and upbringing of that child; and when the safety and best interests of the child demand it, the rights of the child must be protected by the court. In citing the above rights of the child, we are not attempting to enumerate all of them, but merely to indicate the principle we have in mind. We believe it is these rights that the courts of this State and other States have in mind when they speak of "the best interests of the child."

The statutory law of our State recognizes the parent's right to his child. The statute, CLS 1956, § 703.6 (Stat Ann 1959 Cum Supp § 27.3178[206]), provides in part as follows:

"The father or mother of the minor, and if 1 of them be deceased, then the survivor thereof, being respectively competent to transact their own business, and otherwise suitable, shall be entitled to the custody of the person of the minor and to the care of his education."

In the case of *In re Adams,* 214 Mich 199, 204, this Court, recognizing the father's right to the child, said:

"The law makes him her guardian by nature and for nurture, prima facie entitled to her care and custody. Bearing in mind also the child's best interests, the courts will primarily 'feel bound to restore the custody where the law places it, with the father, unless in a clear and strong case of unfitness on his part to have such custody.' "

In the case of *Chevlin* v. *Tarner,* 274 Mich 249, 251, this Court said:

"The mother seems now to be established in a suitable home and to be capable of taking and caring for her son. * * * She has never yielded her legal right to the custody of this child. * * *

"That the child has been well cared for in the home of the grandparents cannot be questioned. * * * Primarily the mother is legally entitled to the custody of her 8-year-old child. * * * Relying much on the facts and reasoning in *In re Goldinger,* 207 Mich 99, the circuit judge found that the mother was entitled to the custody of this child."

The Court affirmed the award of the child to the mother.

The same rule was followed in *Greenman* v. *Greenman,* 249 Mich 388. See, also, *Burkhardt* v. *Burkhardt,* 286 Mich 526; *Riemersma* v. *Riemersma,* 311 Mich 452; *Shinkonis* v. *Johnstone,* 312 Mich 199.

In *Riemersma* v. *Riemersma, supra,* 461, the Court quoted from the case of *Burkhardt* v. *Burkhardt, supra,* 535, as follows:

" 'The choice of a child of the tender age of 4 years cannot be considered by the court in its determination of what disposition shall be made of the case.' "

In the instant case it is admitted the Shiftans have provided well for the child. Although the record discloses the father made only 3 trips from New York to visit his daughter, he did write regularly and on several occasions sent her gifts. It is natural the child would be attached to her present home and to the Shiftans, since it is the only home she has ever known. The record discloses the present Mrs. Herbstman is willing and anxious to take the child into her home and give her proper care. To infer that it would not be for the best interests of the child to live in a proper home in New York City requires no answer. Certainly the lower court had no basis on the record to find the suggested drugging

of the child indicated an inhuman attitude on the part of petitioner, any more than it would have been indicated on the part of Mrs. Shiftan. She testified a third party suggested giving the child a sleeping shot so that she might be brought to New York. No one attributed this remark to petitioner.

The reasons given by the trial court for dismissing the writ in the instant case are insufficient for denying custody to the father.

We conclude, on the showing in this record, that the father is a suitable person to have custody of his daughter and that he is legally entitled to such custody.

Other questions raised by defendants do not require consideration.

The order of the trial court dismissing plaintiff's petition is vacated and set aside. The case is remanded to the lower court with directions to enter an order granting plaintiff's petition and awarding him custody of his daughter forthwith. Plaintiff shall recover costs.

DETHMERS, C. J., and CARR, KELLY, SMITH, EDWARDS, and SOURIS, JJ., concurred with KAVANAGH, J.

BLACK, J. (*dissenting*). The epic of Evangeline's exile meets its tragic analogue with release of these opinions. The only difference is that a trustful and unsuspecting little girl*, rather than a betrothed and saddened young lady, is the subject of sentence by today's "scientific" order for deportation to tenement life in Brooklyn.

When habeas corpus inquires into the custody of an infant child, legal rights are not measured and severed for the court's judgment as are butcher-cleft chops for the frying pan. Solomonic judgments in child custody cases are no more. Even in ordinary

---

* Hanna Rachel Herbstman, born October 10, 1954.

legal proceedings an asserted "right" remains an abstraction until, in the course of judicial process, it is shown properly as being actionable.  One may have a right and yet fail in the enforcement thereof for want of proof that, in the immediate as against predictive context of things, he is entitled to such enforcement.  And when the proceeding at hand is, as here, essentially equitable, the rule brooks no interference in all enlightened courts.

The quality of justice due this minikin refugee should not be strained through the exacting colander of strict legal right.  By the great weight of authority in this country, the British rule—that habeas corpus in child custody cases must or must not issue by the principles of legal right—has been uniformly rejected.  See collection of authorities, 39 Am Jur, Parent and Child, § 20, p 608, and *In re Gould,* 174 Mich 663, 670.  The best interests of the unrepresented child become the issue of chief importance. Determination of such interests always prevails over any mere preponderance of legal right when the 2 principles—right versus welfare—temporarily or permanently conflict with each other.  Surely in this field, of all those appellate courts are called upon to survey, each judge should kneel for delivery of that legendary prayer Justice Cardozo has recorded for us:

"There is an old legend that on one occasion God prayed, and his prayer was 'Be it my will that my justice be ruled by my mercy.'  That is a prayer which we all need to utter at times when the demon of formalism tempts the intellect with the lure of scientific order."  Nature of the Judicial Process, p 66.

In this case the natural father of a little girl, himself hardly known to her, would by habeas corpus take her from the only place she knows as "home," and the only persons she knows as parents, to live

with himself and a totally unknown stepmother in faraway Brooklyn. Judge Falahee, having weighed the father's legal right against the child's welfare, found in a well-reasoned opinion that the latter—upon the record before him—should prevail over the former. I agree, with emphasis upon the sometimes forgotten rule that judges themselves should "let well enough alone" when called upon to test assurance against possibility in child custody cases.*

Our leading case, wherein the authorities were collected upon the pivot of the quoted axiom, is *In re Gould, supra.* Quotation from that case, as follows, presents the thrust of this dissent:

"Not only do the interest and affection they have shown, and the care and support they have given him, entitle them to some consideration as against a prospect, but they give assurances for the future. What they have done tends to show what they are willing to and will do. Their pecuniary condition is ample to enable them to provide for his maintenance and education during minority, and much more if so inclined. There is nothing to indicate any financial advantage to him in a change of custody, or that he will in any way be better educated, trained, or treated, or his welfare in any particular be promoted if he is taken from his present home and compelled to go with petitioner. He is well provided for now, and, in the language of Justice Brewer in *Chapsky* v. *Wood,* 26 Kan 650, 656 (40 Am Rep 321),

" ' "Let well enough alone" is an axiom founded on abundant experience.'

"The case of *Pool* v. *Gott,* 14 Law Reporter 269 (a Massachusetts case apparently not regularly pub-

---

* "It is well settled that cases of this kind are of an equitable nature and courts are not bound by the bare legal rights of the contending parties or strict technical rules of procedure, but are vested with a sound judicial discretion in ascertaining and determining the paramount question of the welfare and best interest of the child (12 RCL, Habeas Corpus, § 34, p 1215)." *In re Leu,* 240 Mich 240, 249, 250; followed in *Fritts* v. *Krugh,* 354 Mich 97, 117.

lished in the reports of that State), is instructive, well in point here, and involves a very similar issue. Pool, the petitioner for writ of habeas corpus, had married the only daughter of respondents, and, she having died, their infant child was left by petitioner in the custody of its grandparents—a course agreeable to all parties, but without any definite arrangements being made as to length of time the child should remain or who should provide for its maintenance. The grandparents supported and cared for the child as their own. Some years later Pool remarried, and, having established a home for himself, sought to reclaim his child. The opinion in that case, delivered by Chief Justice Shaw, radiates the prevalent tone of our best authorities on the interesting and delicate subject of the right of custody of infants as between near relatives. On a review of the whole case from every angle, it was held that the child should remain in the custody of its grandparents, to whom it was devotedly attached and with whom it preferred to live; the leading principle being that, when the right of the parent is not clear and imperative, the best interests and happiness of the child must always control the decision of the court." (pp 672, 673.)

I would adopt Judge Falahee's opinion and present it to the profession as follows (deleting only extensive quotations from *Fritts* v. *Krugh,* 354 Mich 97, and authorities considered therein):

"This is a habeas corpus proceeding instituted by the father of the minor child, alleging that the said minor child is being detained from his custody by the respondents, who are the maternal uncle and his wife of said minor child.

"The child's mother died in childbirth on or about the 10th day of October, 1954; that, following her death, the child was placed in a children's home in her native Israel for a period of approximately 18 months.

"On the 7th day of June, 1956, she arrived in this country in the company of her father, the petitioner herein, and her older brother now age 11, which would have made him approximately 8 years old at the time.

"At the time of their arrival in this country, the petitioner's brother was residing in New York City and his brother-in-law, the respondent, and his wife were residing in Jackson, Michigan, these apparently being the only people he knew in this new and strange country.

"The petitioner and his daughter came to Jackson where they established their home with the respondents. Work was eventually found by the petitioner at Furman's Clothing Store as a tailor, his particular trade. However, after 1 week, he quit his job and sought work in the eastern part of the country. At this time he left the minor child, Hanna, with the respondents and took his little boy with him on his venture to New York.

"The petitioner eventually found employment in New York and on January 25, 1958, he married his present wife. It was after his remarriage that he informed the respondents that he wanted to take the minor child, Hanna, to New York. However, due to the fact that Mr. Shiftan was going to Germany, it was requested that he wait until the respondent returned to the States.

"The 2 subsequent attempts by the petitioner to take his child to New York were voluntarily abandoned by him due to the reaction of the little girl. By his testimony, he stated that the little girl always carried on and that he could not take her with him. According to Mrs. Shiftan's testimony, on one of the occasions the petitioner suggested that a shot be given the little girl to 'knock her out.' However, this means of taking her was strongly objected to by the respondents as being inhuman and cruel.

"The petitioner's testimony also revealed that he has never been denied any rights relative to the child whenever he decided to use them and, further, that

he did not support or offer to support her, but during this period of time he did give 2 gifts to the child, a Lassie dog and a tricycle.

"The petitioner testified that his present wife is willing to take the child into her home. However, there was no testimony from her on the matter, nor did she appear in court for the hearing on said writ.

"There is a line of Michigan cases which hold that a parent is entitled to custody of a minor child unless it is clearly shown that it is not for the best welfare of the child. *In re Goldinger,* 207 Mich 99; *Partch* v. *Baird,* 227 Mich 660; *Fritts* v. *Krugh,* 354 Mich 97.

"That seems to be the established principle of law in Michigan. Therefore, we must immediately pass to the second question. If the father is given custody here, will the best interest of the child be served?

"The child is presently living with her deceased mother's brother and his wife. She has been with them since she was 1-1/2 years old. The child is now 5 years old. Her father appears to be practically a stranger to her. The child seems to realize what is taking place and definitely does not want to leave her present home. She knows no other mother than Mrs. Shiftan. The child has a good home and is happy where she is. On previous occasions the Shiftans were willing that the child return with the father to New York City; however, on each occasion the child put up such a fuss that it was not followed through. On one occasion the petitioner was told to drug the child and take her while she was sleeping. This Mrs. Shiftan rightfully refused to have carried out.

"The petitioner appears to be a good man, and the home in New York City, as far as size, seems to be adequate. Mr. Herbstman's present wife was not at the hearing. Therefore, her fitness to mother this child is unknown. The petitioner has visited the child only 3 times since she has been with the Shiftans. He has not supported the child, although

he did give the child 2 gifts, a Lassie dog and a tricycle. He stated on cross examination that the principal reason he wanted the child was so that she could be raised in the Jewish religion.  *  *  *

"Realizing that the Michigan cases are strong in support of the father having custody, I am very convinced that the best interest of this child is with the Shiftans. To take her out of her present home and place her in strange, new surroundings in New York City, would have a detrimental effect on this child. As was stated so ably in counsel for Shiftans' brief:

" 'The respondents have proven themselves to be suitable people to have the custody of Hanna, and she appears to be happy and enrolled in a local school, being in kindergarten at St. Stanislaus School which is the finest school kindergarten in her neighborhood. She has been given the motherly love and attention that she has never had, due to the untimely death of her mother. To place her now in a strange home, with a father she does not know and with his wife whom she has never seen or talked to, will have an irreparable effect upon her future and welfare. She has suffered enough in her short 5 years upon this earth, and we contend that she should not be compelled to endure further suffering merely because her father's present wife is desirous of having a daughter in her home and yet could not find the time to come before the court and tell of her burning desire to have the child with her.'

"It is the opinion of this court that the child should remain with the Shiftans. Recognizing that by an abstract principle of law the father has superior rights, nonetheless the welfare of the child will be best served where she is.

"To make it clear how I arrive at this and so that there may be no misunderstanding, I will state the following:

"1. The Shiftans have raised the child well without help from the father. .

"2. The father has made only 3 visits to see this child in 3–1/2 years.

"3. The child's love for its present home and the Shiftans' love for the child.

"4. The character and reputation of the present Mrs. Herbstman are unknown.

"5. Taking the child from its present home and placing her in congested New York City would not be for the best interest of this child.

"6. The suggested drugging of the child on a previous occasion shows an inhuman attitude.

"As Mr. Herbstman stated, he was interested in seeing the child raised in the Jewish religion. In leaving the child with the Shiftans, I am going to make it an order that they contact our local rabbi as concerns having this child schooled in the Jewish religion, and to follow through with said schooling as far as the local Jewish synagogue can so teach it. Also, the father is to have liberal visitation rights to see his child, and the Shiftans should, when possible, visit him in New York City with the child.

"I feel that it is the duty of our courts, before relinquishing jurisdiction over a minor child to a foreign State, to be very convinced that the best welfare of the child will be served in the other State before relinquishing custody to that State; and in this matter I am not convinced that the best welfare of the child would be served by giving custody to the father."

Even if we were authorized to review Judge Falahee's findings upon the facts (which we are not; *Corrie* v. *Corrie*, 42 Mich 509; *In re Gould, supra*), I would not join in sentencing this innocent youngster to a life over which our courts will have no control. Once today's order carries the little girl to Flatbush, the courts of Michigan automatically become helpless to retrieve that order even though the ordered trial of child with unknown stepmother results in gross mistrial.

The petitioning father actually abandoned Hanna to her maternal uncle and aunt when he departed Jackson (in June of 1956) for other climes and other work. He left her to the steadily bestowed and laudable care of those Hanna goes to and trusts as father and mother. He would now take her to a strange and untried life in a Brooklyn flat with a stepmother neither she nor any Michigan judge has ever seen. Little wonder the child's terror when the father came to Jackson and attempted to take her to Brooklyn. The attempt became so difficult as to require abandonment thereof, and it was followed later by suggestion of the father (or someone in his behalf)* that the child be drugged in order that the transfer might be made without "fuss."

Michigan's "Big Four" have provided an appropriate conclusion for this opinion (*Corrie* v. *Corrie, supra,* p 510):

"In contests of this kind the opinion is now nearly universal that neither of the parties has any rights that can be allowed to seriously militate against the welfare of the child. The paramount consideration is what is really demanded by its best interests. It is doing no violence to what is taught by judicial experience to assume that the disputing parties will be more alive to the satisfaction of their own feelings and interests than to the true end of the inquisition; while the innocent subject of the contention is utterly unable to speak or act for itself, and is in danger of being lost sight of in the strife for its possession."

I would affirm, noting with emphasis that the absence from court of the proposed stepmother was—alone—a sufficient reason for denial by the judge of the writ as sought.

---

* The testimonial record, made in part with the aid of an interpreter, leaves the question of identity of the party making this suggestion (it was made by long distance telephone call from New York) in doubt. The suggester had to be—by irresistible inference—the petitioning father or the court-absent stepmother.