John DOE, Jane Doe, Thomas M. Grost, and Cora W. Grost, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

Cathy E. IRWIN, Administrator, and George Gross, D. O., Medical Director, Tri-County Family Planning Center, Elinor Holbrook, Gilda Richardson, Marie Vande Bunte, Mary Kay Wickens and David Holden, M. D., Members of the Ingham County Board of Health, Mary Woods, R. N., Acting Director, Ingham County Health Department, and their successors in office, Defendants.

Civ. A. No. G75-142.

United States District Court, W. D. Michigan, S. D.

Nov. 23, 1977.

**1248**

Hubbell, Blakeslee, McCormick & Houlihan, Traverse City, Mich., for plaintiffs; Stuart D. Hubbell, Traverse City, Mich., of counsel.

Peter A. Cohl and Larry A.. Salstrom, Ingham County Corp. Counsel, Lansing, Mich., for defendants.

## OPINION

FOX, Chief Judge.

This matter is again before the court upon the remand of a panel of the Sixth Circuit Court of Appeals for reconsideration in light of *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). My examination of the plurality, concurring, and dissenting opinions in *Carey* convinces me that my opinion and order in this matter of March 7, 1977 were properly issued. That opinion found defendants' practice of distributing "prescriptive contraceptives and contraceptive devices to minor, unemancipated children in the absence of notice to, and the opportunity of consultation with, their parents" violated the constitutional rights of such parents. Therefore I readopt the opinion and order previously entered by this court as part of the present opinion. This opinion upon remand, in addition to explaining why *Carey* supports the previous opinion of this court, also provides an opportunity to explore in greater depth the rights plaintiffs assert here. This latter area will be discussed first.

Defendants re-argue that no rights of the plaintiff parents, if any exist in the present context, are invaded by the actions of the defendants. Defendants contend, first, that the fact that the clinic operates in a totally voluntary manner renders it impossible for the clinic to violate the rights of the parents to the free exercise of religion under the First Amendment. That is, they continue, the county requires no child to come to the clinic; no parent is prohibited, restricted, or restrained in the exercise of their religious beliefs; and no parents are prevented from inculcating their religious beliefs upon their children. Defendants cite this court to cases holding that the Free Exercise rights of plaintiffs who oppose pre-marital intercourse on religious grounds are not violated by the use of their tax dollars for birth control clinics, *Civic Awareness of America, Ltd. v. Richardson,* 343 F.Supp. 1358 (E.D.Wis.1972), and holding that the right of parents to teach their children about sexual matters in their own homes was not violated by the teaching of birth control in public schools, *Cornwell v. State Board of Education,* 314 F.Supp. 340 (D.Md.1969), *affirmed,* 428 F.2d 471 (4th Cir.1970), *cert. denied,* 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246.

Defendants next argue that the Establishment Clause is not violated as the practices engaged in by the defendants do not favor a specific religion or belief. It is also claimed that the distribution of contraceptives to children has a secular purpose which neither advances nor inhibits any religion and is, therefore, not constitutionally impermissible. For this contention, defendants rely upon *McGowan v. Maryland,* 366 U.S. 420, 465–66, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), and *Civic Awareness, supra* at 1361.

The facts present here are not identical to the fact situations involved in the cases cited by defendants. Contrary to defendants' arguments, there are fundamental differences involved in the present case. I have recognized from the first that this case comes before me in a posture unlike the typical case involving a minor's access to abortions or contraceptives. The plaintiffs are not minors, who in seeking to obtain contraceptives challenge a state statute affirming parental authority. Rather, plaintiffs are parents who seek to preserve their parental and familial rights against action by a state agency. To prevail, plaintiffs must establish such parental and familial rights. They must then show that these rights are invaded by state action. If these first two conditions are met, the rights of the plaintiffs must then be weighed against any rights asserted by their children and against the interests asserted by the State.

The rights of parents to the custody, care, and religious and moral education of their children is firmly established in the tradition and laws of this nation. The rights of parents and the family were extensively described in my initial opinion. These rights were concisely detailed by the Supreme Court as follows:

"[C]onstitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic to the structure of society. 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations *the state can neither supply nor hinder.*'" (Emphasis added.) *Ginsberg v. New York,* 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968), quoting *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed.2d 645 (1944).

■ Parental authority is plenary. It prevails over the claims of the state, other outsiders, and the children themselves. There must be some compelling justification for interference.

As one writer has stated:

"The common law has long recognized parental rights as a key concept, not only for the specific purposes of domestic relations law, but as a fundamental cultural assumption about the family as a basic social, economic, and political unit. For this reason, both English and American judges view the origins of parental rights as being even more fundamental than property rights. Parental rights to custody and control of minor children have been variously described as 'sacred' as a matter of 'natural law,' and as 'inherent, natural right[s], for the protection of which, just as much as for the protection of the rights of the individual to life, liberty, and the pursuit of happiness, our government is formed.' *These judicial word choices imply that the parent-child relationship antedates the state in much the same sense as natural individual rights are thought to antedate the state in American political philosophy.* It has been said:

Our political system is superimposed on and presupposes a social system of family units, not just of isolated individuals. No assumption more deeply underlies our society than the assumption that it is the individual [parent] who decides whether to raise a family, with whom to raise a family, and, in broad measure, what values and beliefs to inculcate in the children who will later exercise rights and responsibilities of citizens and heads of families. . . . .

. . . [T]he family unit does not simply co-exist with our constitutional system; it is an integral part of it. In democratic theory as well as in practice, it is in the family that children are expected to learn the values and beliefs that democratic institutions later draw on to determine group directions. The immensely important power of deciding about matters of early socialization has been allocated to the family, not to the government." [1] (Emphasis added.)

In *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the Court invalidated, under the due process clause of the Fourteenth Amendment, a state statute prohibiting foreign language instruction to school children. *Meyer* recognized the right of German-speaking parents to have their children taught German. In the course of the opinion, the Court referred expressly to the social structure discussed in Plato's *Republic,* in which family life was to be replaced entirely by state child-rearing activities so pervasive that "no parent is to know his own child, nor any child his parent." [2] The Court continued:

---

1. Hafen, Children's Liberation and the New Egalitarianism: Some Reservations About Abandoning Youth to Their "Rights," 1976 Brigham Young U.L.Rev. 604, 615–617 [hereinafter cited as Hafen].

2. Id., 262 U.S. at 401–02, 43 S.Ct. at 627, 67 L.Ed. at 1046.

"Although such measures have been deliberately approved by men of great genius, their ideas touching the relation between individual and State were wholly different from those upon which our institutions rest; and it hardly will be affirmed that any legislature could impose such restrictions upon the people of a State without doing violence to both letter and spirit of the Constitution." [3]

Strong statements about independent parental interests were also made in *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). *Stanley* held that a state statute providing that illegitimate children, upon the death of their mother, became wards of the state without a hearing on the parental fitness of the father, was constitutionally repugnant. The Court held that the father was entitled to such a hearing under the Fourteenth Amendment, stating:

"The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.' " [4]

The derivation of these parental and familial rights was closely examined in the concurring opinion of Justice Goldberg in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), a decision upholding the right of married couples to use contraceptives despite the presence of a state law to the contrary:

"This Court, in a series of decisions, has held that the Fourteenth Amendment absorbs and applies to the States those specifics of the first eight amendments which express fundamental personal rights. The language and history of the Ninth Amendment reveal that the Framers of the Constitution believed that there are additional fundamental rights, protected from governmental infringement, which exist alongside those fundamental rights specifically mentioned in the first eight constitutional amendments.

The Ninth Amendment reads, 'The enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people.' The Amendment is almost entirely the work of James Madison. It was introduced in Congress by him and passed the House and Senate with little or no debate and virtually no change in language. It was proffered to quiet expressed fears that a bill of specifically enumerated rights could not be sufficiently broad to cover all essential rights and that the specific mention of certain rights would be interpreted as a denial that others were protected.

.    .    .    .    .

[It is] clear that the Framers did not intend that the first eight amendments be construed to exhaust the basic and fundamental rights which the Constitution guaranteed to the people.

.    .    .    .    .

In determining which rights are fundamental, judges are not left at large to decide cases in light of their personal and private notions. Rather, they must look to the 'traditions and [collective] conscience of our people' to determine whether a principle is 'so rooted [there] .    .    . as to be ranked as fundamental.' (Citation omitted.) The inquiry is whether a right involved 'is of such a character that it cannot be denied without violating those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions" .    .    .' (Citation omitted.) 'Liberty' also 'gains content from the emanations of .    .    . specific [constitutional] guarantees' and 'from experience with the requirements of a free society.' (Citation omitted.)

.    .    .    .    .

**3.** Id., 262 U.S. at 402, 43 S.Ct. at 628, 67 L.Ed. at 1046.

**4.** Id., 405 U.S. at 651, 92 S.Ct. at 1212, 31 L.Ed.2d at 558.

. . . 'Certainly the safeguarding of the home does not follow merely from the sanctity of property rights. The home derives its pre-eminence as the seat of family life. And the integrity of that life is something so fundamental that it has been found to draw to its protection the principles of more than one explicitly granted Constitutional right. . . .' The entire fabric of the Constitution and the purposes that clearly underlie its specific guarantees demonstrate that the rights to marital privacy and to marry and raise a family are of similar order and magnitude as the fundamental rights specifically protected." [5]

█ The rights which plaintiffs assert here are at the heart of our nation's traditions and collective conscience. It needs no further discussion to conclude that the right of parents to the care, custody, and nurture of their children is of such a character that it cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions. As such, the rights the plaintiffs seek to assert here are fundamental rights protected by the First, Fifth, Ninth, and Fourteenth Amendments of the United States Constitution.

█ It is on the next question, whether these parental and familial rights were invaded by the actions challenged here that,

as I have previously noted, defendants raise their strongest arguments. But I am convinced that plaintiff parents have shown such an invasion.

In the first instance, the religious beliefs of the plaintiffs are implicated by the actions challenged here. The record contained the uncontroverted affidavits of officials of both the Morman and Baptist denominations in Michigan asserting that state policies facilitating premarital sex and failing to recognize parental prerogatives were inimical to their deeply held religious beliefs. Additionally, the family's penumbral right of privacy is implicated when the sexual mores of an unemancipated minor are involved and inquired into—an area in which the parents' right of instruction and control have always been recognized as preeminent.

I see two major factors which make *Civic Awareness, supra,* and other similar cases inapplicable here. First, the actions of the Center reach directly into the home and invade the long respected zone of parental authority. The Center is not confining itself solely to the furnishing of sex education and birth control information. The findings of fact and the record indicate that the Center both inquires into the sexual mores of the children and their relations with their parents, and furnishes them prescriptive contraceptives which could have

---

**5.** Id., 381 U.S. at 488–90, 492–95, 85 S.Ct. at 1683–88, 14 L.Ed.2d at 517–18, 520–22.

The liberty interest in family privacy was recently restated as follows:

"It is beyond peradventure that 'freedom of personal choice in matters of . . . family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.' *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974). The existence of a 'private realm of family life which the state cannot enter,' *Prince v. Massachusetts, supra,* 321 U.S. at 166, 88 S.Ct. 1274, 'has its source . . . not in state law, but in intrinsic human rights, as they have been understood in "this Nation's history and tradition."' *Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 845, 97 S.Ct. 2094, 2110–2111, 53 L.Ed.2d 14 (1977) (footnote and citation omitted).

Here we are concerned with the most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state. This right to the preservation of family integrity encompasses the reciprocal rights of both parent and children. * * *

This mutual interest in an interdependent relationship has received consistent support in the cases of the Supreme Court.

* * * * * *

While there may be some doubt as to the precise definition of the 'family,' * * *, there can be no question that the liberty interest in family privacy extends to a mother and her natural offspring as are involved in this case. * * *" *Duchesne v. Sugarman,* 566 F.2d 817 (2d Cir. 1977).

dangerous and possibly fatal side effects. The capacity of the minor to make decisions in both these areas is implicated.

The record shows that physical maturity precedes emotional maturity by as much as five years. Even one of defendants' experts testified that too early sexual intercourse among children could be traumatic or be symptomatic of other, deep-seated emotional problems. Defendants admit that the procedures used at the Center are not aimed at determining emotional maturity of the children who seek the Center's services. Prescriptive contraceptives are distributed, in the absence of medical contraindications, solely upon the basis that they are requested.

There is no magic age at which a person reaches maturity—some persons unfortunately never do. There may be many minors who have complete maturity and are able to make these types of decisions. But there are, undeniably, many minors who lack the capacity to make responsible decisions whether or not to engage in intercourse, or whether or not to assume the risk of dangerous side-effects of prescriptive contraceptives. The parents of such minors have always been recognized as having the right, coupled with the duty, to guide their children in making such decisions. A state-run clinic, predisposed to prescribe contraceptives and having only minimal contact with the child, cannot and should not attempt to displace the parents' rights in such matters.

On a more practical level, the interests of the parents are also involved by the defendants' actions. As I have previously noted, a child whose parents and physician are not aware that she is taking a prescriptive contraceptive may not be adequately treated if she suffers serious complications from the use of the contraceptive pill. Under Michigan law, the parents of such child would be responsible for the expenses of such treatment of their daughter if, for instance, she suffers blood clots or other side effects as a result of using the contraceptives distributed by defendants. *Herbstman v. Shiftan,* 363 Mich. 64, 108 N.W.2d 869 (1961); *Ebel v. Brown,* 70 Mich.App. 705, 246 N.W.2d 379 (1976).

The second factor distinguishing this case from the cases defendants rely upon, and the difference which I find most important, is that the Center is interacting with the children of the plaintiffs in a manner which keeps the parents in total ignorance of what is occurring. In the present case the Center is, whether or not it is done intentionally, influencing the children of the plaintiffs—an influence these parents find insidious and invidious. Unlike the cases relied upon by the defendants, the parents here are not put on notice as to what these influences are and, therefore, cannot begin to exercise their parental rights to counteract such influences in the manner they see fit.

Where parents seek to exclude a book from the library of their child's public school on religious grounds, or where a parent seeks to restrain a public school, on religious grounds, from teaching sex education (as in *Cornwell v. Board of Education, supra*), the rights of the parents, although implicated, are not invaded. They have notice or are able to inform themselves of what they consider to be contrary influences on their child and are in a position to counteract those influences as they see fit.[6] The plaintiffs in the present case, totally excluded from the state's contact with their children in this important area, are denied that same right.

In cases such as *Yoder v. Wisconsin,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the Supreme Court agreed with parents whose alternatives to raise and educate their children as the parents desired had been restricted by state action. The state action

**6.** Another distinguishing factor is that the banning of a book that one parent finds offensive from a public school library limits the rights of other parents who desire their children to read that book. Notice to parents here in no way would deprive parents, who desire their children to obtain birth control information and medication from the Center, of their rights.

challenged here, although different in kind from that in *Yoder* and *Pierce,* is little different in result. The fact that the defendant clinic surreptitiously interacts with the child and secretly provides the child with prescriptive, potentially hazardous, contraceptives, has the practical result of restricting parents' alternatives both in the exercise of authority in their own households and of responsibility to direct the rearing of their children.

The parents here are not prohibited in any way, by the actions of the defendants, from inculcating their religious and moral beliefs upon their children. But it is an invasion of parental rights to require them to anticipate in advance the multitude of situations which may act upon their children and prepare them in advance to deal with any moral question that may arise in the course of that child's young life, particularly where the parent is prevented from being made aware of the actions of a state-run agency which facilitate a situation inimical to the values the parents are attempting to teach their children. For instance, parents may teach their children general principles of honesty or sexual morality. When parents are able to become aware of what books their children are reading at school they are in a position to relate these general principles to the particular situations in the book which the parents may feel are dishonest or morally inexacting. This is how parents have, and always should, nurture, care for, and educate their children. But where parents are prevented from becoming aware of what their child is reading the parents are prevented from relating the general moral and religious principles they have attempted to teach their child to particular fact situations encountered by that child in his or her daily life. The opportunity to relate these general principles to particular situations, thereby making these principles clear and alive to the child, is denied to such parents. The activities carried out by the defendants are no different. The activities carried out

by the defendants invade and supplant these parental rights.

Were the clinic only providing birth control information to children in a manner enabling the parents to become aware of such contacts, the parents could familiarize themselves with the information being provided and counsel their children as they desire. The facts of this case are different, however, and so long as the defendant Center continues to treat children in a manner whereby the parents of those children cannot become aware of the contact and continues to prescribe potentially hazardous medication to such children in the absence of notification to their parents, the parental rights of the plaintiffs will continue to be invaded.[7]

There are, then, three factors which combine here. First, the fact that parental privacy and religious beliefs are implicated. Second, the decisions undertaken here by minors who may lack the capacity to make decisions in this area (and who have had only brief consultation with state officials) are within the sphere of decisions which parents are uniquely positioned to evaluate from the standpoint of the maturity and capacity of their offspring and to provide the necessary guidance. Finally, and most importantly, these actions are carried out in an atmosphere of secrecy which fails to put parents on notice as to the state's actions relative to their children and has the practical result of depriving parents of alternatives to counteract such actions, if they so desire. Any one of these factors may be significant enough to support the result which this court has reached. The combination of such factors, however, is so serious that I conclude that the parental rights asserted here are seriously invaded by the actions of the defendant Center, taken under color of state law.

◼ Defendants continue to argue that minors have a fundamental constitutional right to obtain contraceptives and that such

---

**7.** By analogy to land condemnation proceedings, the actions of the Center amount to a constructive taking of the rights of the parent to the care, custody, and nurture of their children.

right would be unduly burdened by a requirement of notification of, and the opportunity for consultation with, the parents of such minors. As I have previously stated, even if there is a fundamental civil right among minors to obtain prescriptive contraceptives, that right need not exist to the total exclusion of any rights of the child's parents. As one writer has commented:

> "Some special interest of parents (distinct from the welfare of their children) has been and should be the subject of legal and constitutional protections. What the parental interest may mean—especially where it is pitted against the interests of children—remains to be developed more fully. Nevertheless, the well-established cultural assumption favoring parental interests requires that the interest of children not be the only factor weighed when considering the state-family relationship." [8]

This same writer continues:

> "The involvement of a constitutional right for minors by no means lifts a case above the practical and policy problems of minority status into some abstract sphere in which an abandonment of that special body of law that has always applied to children is justified. When both parents and children are involved . . the law must concern itself even more with that special context, since a court must then confront the unique legal and social role of parents.
>
> It is doubtful whether the children's rights decisions of the United States Supreme Court warrant the conclusion that, by interjecting concerns of constitutional dimension into state processes involving minors, the Court has intended to say that the presumptions justifying the treatment of minors as a special class have become outmoded. None of the relevant cases imply that the actual capacities of minors have changed in any way

that requires a change in the legal rules or assumptions that grew out of the traditional view that the competence of minors to exercise adult rights is limited. The oversimplified reasoning of courts that believe recent constitutional case law has made the 'rights' of minors 'prima facie . . . coextensive with those of adults' is especially dangerous, since such reasoning permits a shift in the crucial presumptions about the status or capacity of minors. . . .

> This shift in presumptions in the laws dealing with minors can come legitimately only after a strong factual showing that there is no longer any basis for the premises underlying traditional treatment of minors. That there has been such a showing regarding the factual premises underlying certain limited aspects of the procedures employed by the juvenile courts or the public schools may illustrate the process by which specific, case-by-case changes in the law's treatment of minors will and should come about; but the showing in those narrow areas dealt primarily with certain procedural issues, not the general question of the capacity of minors. These cases offer no justification for abandoning an established, factually based presumption, the disappearance of which would have almost limitless consequences for American law." [9]

The Supreme Court continues to recognize that many rights fundamental to adults depend upon the capacity of the person seeking to exercise those rights and may be denied in certain instances to minors.[10] Indeed, the very concept of a separate juvenile justice system, with differing rights for the minor, has been upheld by the Supreme Court.[11] The premise of the juvenile system is "that children who are yet in the developmental stages of becoming ma-

---

**8.** Hafen, *supra* note 1, at 628–29.

**9.** Id., at 641.

**10.** *See*, e. g., *Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (right to vote); *Ginsberg v. New York*, 390 U.S. 629, 88

S.Ct. 1274, 20 L.Ed.2d 145 (1968) (differing obscenity standards for minors permissible).

**11.** *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971).

ture adults should be protected against the long term implications of their own decisions made at a time when they lack sufficient capacity and experience to be held as responsible as an adult would be for the same decision." [12]  As was said by Justice Stewart, concurring in *Ginsberg, supra:*

"The First Amendment guarantees liberty of human expression in order to preserve in our Nation what Mr. Justice Holmes called a 'free trade in ideas.' To that end, the Constitution protects more than just a man's freedom to say or write or publish what he wants. It secures as well the liberty of each man to decide for himself what he will read and to what he will listen. The Constitution guarantees, in short, a society of free choice. Such a society presupposes the capacity of its members to choose.

.    .    .    .    .    .

I think a State may permissibly determine that, at least in some areas, a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." [13]

Professor Hafen comments:

"The term 'choice rights' as it has been used here applies to minors' decisions having serious long term consequences that have traditionally required either legal or parental approval (or both) in order to be enforceable. To suggest that legal rights of this special character should not be given premature approval is, however, not to argue for increased state-supported parental interference with the vast variety of less solemn choices that arise daily in the lives of children. Indeed, the availability of gradually increasing freedom to live with the consequences of one's own decisions is a critical element in the development of mature judgmental capacities. Still, the development of the capacity for responsi-

ble choice selection is an educational process in which growth can be smothered and stunted if unlimited freedom and unlimited responsibility are thrust too soon upon the young. Moreover, the lifelong effects of binding, childish choices can create permanent deprivations far more detrimental than the temporary limitations upon freedom inherent in the discipline of educational processes.

"The development of the capacity to function as a mature, independent member of society is essential to the meaningful exercise of the full range of choice rights characteristic of the individual tradition. Precisely because of their lack of capacity, minors should enjoy legally protected rights to special treatment (including some protection against their own immaturity) that will optimize their opportunities for the development of mature capabilities that are in their best interest. Children will outgrow their restricted state, but the more important question is whether they will outgrow it with maximized capacities. An assumption that rational and moral capacity exists, when in fact it does not exist, may lead to an abandonment of the protections, processes, and opportunities that can develop these very capacities. In this sense, the concept of restricting certain choice rights is in fact an important form of protection rights. For these reasons, some distinction between rights of protection and rights of choice must be preserved. As suggested above, the existing children's rights decisions of the Supreme Court could reasonably be categorized as cases involving rights of protection only. It would be both inappropriate and contrary to the ultimate interests of children to construe those decisions as encouraging the removal of traditional constraints upon minors' exercise of choice rights. [14]

Another factor indicating the lack of capacity among adolescents for making decisions having long term consequences is the

---

12.  Hafen, *supra* note 1, at 646.

13.  390 U.S. at 649–50, 88 S.Ct. 1285–86, 20 L.Ed.2d at 209–210.

14.  Hafen, *supra* note 1, at 650.

peer pressure which is often the primary motivating factor in the lives of adolescents. The effect of peer pressure has been described as follows:

"[O]ne of the deepest of adolescent needs is the need to be supported and approved by his peers. Deviations of any sort from the mode are painful. An adolescent cannot afford to risk the ridicule of his intimate friends because he is too dependent upon them for approval. The peer group is a powerful force in setting standards of behavior and attitudes towards various problems. As long as the individual adolescent conforms in the main to the standards and opinion of the group, he is accepted. If he does not conform, he tends to see his group as less attractive than it was earlier, and his age-mates tend to reject him. As the years pass, the values of the crowd gradually mature and approach the adult norm for their social group. Also, the crowd tends to disintegrate under the pressures of later adolescence and early maturity. But while it endures, it is the most formative influence in the life of the average boy or girl." [15]

In deciding whether or not to engage in sexual intercourse and whether or not to undertake the risks of prescriptive contraceptives, peer pressure among youths is no less a motivating factor. This pressure comes from peers who are no more likely to possess the necessary maturity to make decisions of this kind than the child who is pressured to make such decisions. In that situation, the loving guidance of the child's parents becomes paramount. The actions of the defendant Center constructively prevent the parents from providing such assistance.

Defendant argues that the fact that the children come to the Center indicates that they have beliefs contrary to those of the parents (this, of course, is not necessarily so) and that any requirement of notice to the parents will deprive the children of

various First Amendment and privacy rights. As I have continued to maintain, such civil rights in the children need not automatically obliterate the parents' rights in this area. As was stated in the majority opinion of *Yoder, supra*:

"Our holding in no way determines the proper resolution of possible competing interests of parents, children, and the State in an appropriate state court proceeding in which the power of the State is asserted on the theory that Amish parents are preventing their minor children from attending high school despite their expressed desires to the contrary. Recognition of the claim of the State in such a proceeding would, of course, call into question traditional concepts of parental control over the religious upbringing and education of their minor children recognized in this Court's past decisions. It is clear that such an intrusion by a State into family decisions in the area of religious training would give rise to grave questions of religious freedom . . ." [16]

The ultimate effect of protecting parental rights here against improper state interference, has been stated as follows:

"Psychoanalytic theory . . . [and] developmental studies by students of other orientations [establish] the need of every child for unbroken continuity of affection and stimulating relationships with an adult.

· · · · ·

To safeguard the right of parents to raise their children as they see fit, free of government intrusion, except in cases of neglect and abandonment, is to safeguard each child's need for continuity. This preference for minimum state intervention and for leaving well enough alone is reinforced by our recognition that law is incapable of effectively managing, except in a very gross sense, so delicate and

---

**15.** L. Cole & I. N. Hall, Psychology of Adolescence 347 (7th Ed. 1970).

**16.** 406 U.S. at 231, 92 S.Ct. at 1541, 32 L.Ed.2d at 34.

complex a relationship as that between parent and child." [17]

The problems which may be the result of improper state interference with the family have been summarized as follows:

"To the extent that governmental policies foster non-committal attitudes on the part of parents—either because parents believe they have no right to give direction to their children, or because they fear that in giving them direction they might meet . . . state-supported resistance . . .—both the children of those families and the larger society will suffer.

For most parents, the 'rights' of parenthood leave them no alternative but an assumption of parental responsibility, because that responsibility, both by nature and by law, can be assumed by no one else until the parent has failed. But when state-enforced policies undermine traditional parental rights, those same policies will inevitably undermine the assumption of parental responsibility. To undermine parental initiative would not be wise because our society has found no realistic alternative to it. The encouragement of parental responsibility for children is certainly less detrimental than a pervasive state assumption of childrearing. *Indeed, the development of policies that encourage parental responsibility is probably the best thing we could do for our children. One might even say that children have a right to such policies.*

The individual tradition is at the heart of American culture. Yet the fulfillment of individualism's promise of personal liberty depends, paradoxically, upon the maintenance of a set of corollary traditions that require what may seem to be the opposite of personal liberty: submission to authority, acceptance of responsibility, and the discharge of duty. The family tradition is among the most essential corollaries to the individual tradition, because it is in families that both children and parents experience the need for and the value of authority, responsibility, and duty in their most pristine forms." (Emphasis added.) [18]

Only an unthinking application of reasoning developed in racial and sexual discrimination cases could lead to a conclusion that once a child expresses ideas in contrast with those of the parent that the parent has no further right to guide, counsel, and educate that child and that the state may then begin to fulfill that function. That is what defendants ask this court to conclude. This court refuses, however, to accept such an invitation.

Turning now to *Carey,* two matters become immediately clear upon a reading of the opinion. First, although a majority of the Court concur in the result, the legal principle used to reach that result does not command a majority. Second, the New York statute in question there prohibited *all* distribution (even by parents to their chil-

---

**17.** J. Goldstein, A. Freud & A. Solnit, Beyond the Best Interests of the Child 13 (1973), quoted in Hafen, *supra* note 1, at 651.

Professor Goldstein has also written:

"The right to family privacy and parental autonomy, as well as the reciprocal liberty interest of parent and child in the familial bond between them, need no greater justification than that they comport with each state's fundamental constitutional commitment to individual freedom and human dignity. But the right of parents to raise their children as they think best, free of coercive intervention, comports as well with each child's biological and psychological need for unthreatened and unbroken continuity of care by his parents. No other animal is for so long a time after birth in so helpless a state that its survival depends upon continuous nurture by an adult. Although breaking or weakening the ties to the responsible and responsive adults may have different consequences for children of different ages, there is little doubt that such breaches in the familial bond will be detrimental to a child's well-being. But 'so long as a family is intact, the young child feels parental authority is lodged in a unified body which is a safe and reliable guide for later identification.' Court or agency intervention without regard to or over the objection of parents can only serve to undermine the familial bond which is vital to a child's sense of becoming and being an adult in his own right." Goldstein, Medical Care for the Child at Risk: On State Supervention of Parental Autonomy, 86 Yale L.J. 645, 649–50 (1977) (footnotes omitted).

**18.** Hafen, *supra* note 1, at 655–56.

dren) of *non-prescriptive, non-hazardous* contraceptives to any minor under age sixteen (while the present case involves primarily prescriptive contraceptives).

Part IV of the *Carey* opinion was joined by only four members of the Court. In cases where a lower court judgment is affirmed by an equally divided Court, the Court has stated:

"While [the affirmance] was conclusive and binding upon the parties as respects that controversy [citation omitted], the lack of an agreement by a majority of the Court on the principles of law involved prevents it from being an authoritative determination for other cases." *United States v. Pink,* 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942).

Cf. *United States v. Friedman,* 528 F.2d 784 (10th Cir. 1976). Although the *Carey* decision on the right of access of minors to contraceptives is not binding as to the legal principles invoked here, it is instructive of the reasoning the Supreme Court might apply if faced with the issue raised here.

In *Carey,* Justices Brennan, Stewart, Marshall, and Blackmun joined in Part IV of the Court's opinion overturning New York's prohibition on the distribution of non-prescriptive contraceptives to persons under sixteen years of age. Justices White, Powell, and Stevens concurred only in the result reached in Part IV. Chief Justice Burger (without opinion) and Justice Rehnquist dissented from the entire opinion. An examination of the individual opinions leads me to the conclusion that a majority of the Court would affirm the result reached in this case.

A majority in *Carey* agreed that, as to adults, a state must show a compelling interest, narrowly drawn to express only those interests, to justify regulations that burden the fundamental right to decide whether to bear or beget a child. Restrictions on the distribution of contraceptives to adults were held to burden the freedom to make such decisions. *Carey,* 97 S.Ct. at 2018.

As to minors, however, the plurality opinion stated that the state need not show a compelling interest, but rather only a "significant state interest" to maintain restrictions inhibiting privacy rights of minors. *Id.* at 2021. The plurality Justices commented on this middle tier "significant interest" test as follows:

"This test is apparently less rigorous than the 'compelling state interest' test applied to restrictions on the privacy rights of adults. See, e. g., n. 16, infra. Such lesser scrutiny is appropriate both because of the States' greater latitude to regulate the conduct of children, *Prince v. Massachusetts, supra*; *Ginsberg v. New York, supra,* and because the right of privacy implicated here is 'the interest in independence in making certain kinds of important decisions.' *Whalen v. Roe, supra,* 429 U.S. at 589, 97 S.Ct. [869], at 876, 51 L.Ed.2d 64 and the law has generally regarded minors as having a lesser capability for making important decisions. See, e. g., Planned Parenthood, [*Planned Parenthood of Central Missouri v. Danforth*] *supra,* 428 U.S. [52], at 102 [96 S.Ct. 2831, 49 L.Ed.2d 788] (Stevens, J., concurring in part and dissenting in part)." *Id.* at n. 15.

The restriction must be a rational means for the accomplishment of some significant state policy. The opinion continued:

"Since the State may not impose a blanket prohibition, or even a blanket requirement of parental consent, on the choice of a minor to terminate her pregnancy, the constitutionality of a blanket prohibition of the distribution of contraceptives is *a fortiori* foreclosed." *Id.*

The plurality rejected New York's argument that the purpose of the statute was to deter the sexual activity of minors by reducing the availability of contraceptives. Quoting *Eisenstadt v. Baird,* 405 U.S. 438, 448, 92 S.Ct. 1029, 1036, 31 L.Ed.2d 349 (1972):

"It would be plainly unreasonable to assume that [the state] has prescribed pregnancy and the birth of an unwanted child . . . as punishment for fornication."

Justice Powell, concurring in the result reached above, rejected the test used by the

plurality to reach that result: "There is . . . no justification for subjecting restrictions on the sexual activity of the young to heightened judicial review." *Id.* 97 S.Ct. at 2027. Justice Powell stated the relevant question when "state laws impinge on the freedom of action of young people in sexual matters is whether the restriction rationally serves valid state interests." Id. at 2028.

Justice Powell found the statute defective in two respects. First, it infringed on the privacy interests of married females between the ages of 14 and 16 (such marital status being legally permissible under New York law). Second, by forbidding parents to distribute contraceptives to their children, the law "unjustifiably interferes with parental interests in rearing their children." *Id.* Justice Powell continued:

"But in my view there is considerably more room for state regulation in this area than would be permissible under the Court's opinion. It seems clear to me, for example, that the State would further a constitutionally permissible end if it encouraged adolescents to seek the advice and guidance of their parents before deciding whether to engage in sexual intercourse. *Planned Parenthood,* 428 U.S. at 91, 96 S.Ct. at 2851 (Stewart, J., concurring). The State justifiably may take note of the psychological pressures that might influence children at a time in their lives when they generally do not possess the maturity necessary to understand and control their responses. Participation in sexual intercourse at an early age may have both physical and psychological consequences. These include the risks of venereal disease and pregnancy, and the less obvious mental and emotional problems that may result from sexual activity by children. Moreover, society has long adhered to the view that sexual intercourse should not be engaged in promiscuously, a judgment that an adolescent may be less likely to heed than an adult. Requiring minors to seek parental guidance would be consistent with our prior cases. In *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), we considered whether there was 'any significant state interest in conditioning [a minor's] abortion [decision] on the consent of a parent or person *in loco parentis* that is not present in the case of an adult.' Id., at 75, 96 S.Ct. at 2844. Observing that the minor necessarily would be consulting with a physician on all aspects of the abortion decision, we concluded that the Missouri requirement was invalid because it imposed 'a special-consent provision, exercisable by a person other than the woman and her physician, as a prerequisite to a minor's termination of her pregnancy and [did] so without a sufficient justification for the restriction.' *Ibid.* But we explicitly suggested that a materially different constitutional issue would be presented with respect to a statute assuring in most instances consultation between the parent and child. *Ibid.,* citing *Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct., 2857, 49 L.Ed.2d 844 (1976). See *Planned Parenthood,* 428 U.S. at 90–91, 96 S.Ct. at 2850–2851 (Stewart, J., concurring)." *Id.,* at 2029.

Justice Stevens also concurred in the result reached, but declined to join the plurality in Part IV for two reasons. First, he felt *Planned Parenthood v. Danforth* was not dispositive because, in his opinion, the Constitution does not necessarily require the same measure of protection to the minor's right to use contraceptives as to the pregnant female's right to abort:

"The options available to the already pregnant minor are fundamentally different from those available to nonpregnant minors. The former must bear a child unless she aborts; but persons in the latter category can and generally *will avoid childbearing by abstention.*" *Id.* at 2031. (Emphasis added.)

Second, he would not leave open the question whether there is a significant state interest in discouraging sexual activity among unmarried persons under 16 years of age:

"Indeed, I would describe as 'frivolous' appellee's argument that a minor has the constitutional right to put contraceptives to their intended use, notwithstanding the combined objection of both parents and the State." *Id.*

Justice Stevens agreed the statute was objectionable for the reasons stated by Justice Powell.

Justice White also expressly did not join in the Court's opinion in Part IV, but concurred only in the result because: "the State has not demonstrated that the prohibition against distribution of contraceptives to minors measurably contributes to the deterrent purposes which the State advances as justification for the restriction." Id. at 2025–26. But Justice White expressly joined in Justice Stevens' statement that:

"I would describe as 'frivolous' appellee's argument that a minor has the constitutional right to put contraceptives to their intended use, notwithstanding the combined objection of both parents and the State."

As noted above, Chief Justice Burger and Justice Rehnquist dissented *in toto.*

Therefore, a close reading of *Carey* indicates a majority of the Supreme Court would support a state statute requiring prior parental notice and consultation before *non-prescriptive* contraceptives are distributed to unemancipated minors.[19] The present case differs substantially from *Carey,* but the differences are such that *Carey* provides additional support for the position previously reached by this court. The instant case involves the distribution of *prescriptive* contraceptives and the many dangerous medical complications attendant thereto. The result reached in the instant case in no way would prevent unemanci-

pated minors from obtaining contraceptives—it would only require prior parental notification and the opportunity for consultation before that civil right, which surely implicates the capacity of the minor, is exercised.

The major factor which distinguishes this litigation from that of *Carey, Planned Parenthood,* and every other case involving the minor's right of access to contraceptives and abortions is that here the minor is not asserting the right (although the court is, of course, cognizant of that right and has found that that position would be adequately represented, as it has been, by the defendants here) against state statutes restricting that right. Rather, this litigation is in the rather unusual posture of parents seeking to vindicate their recognized rights of privacy and rights of free exercise of religion in the care, custody, control, and education of their children, against interference, under the color of state law, by a state-funded and state-controlled family planning clinic.

As I noted in my previous opinion, the actions undertaken by defendant Center are in fact contrary to the prevailing policy of Michigan law.[20] That this is so is indicated by a recent amendment to the Michigan statute prohibiting the teaching of birth control methods in public schools. This amended statute, which has passed both the Michigan House and Senate and is awaiting signature by the Governor, provides in part as follows:

"M.C.L.A. § 380.1506(1):

A program of instruction in reproductive health shall be supervised by a registered physician, a registered nurse, or a person holding a teacher's certificate qualifying

---

19. Cf., Comment, The Validity of Parental Consent Statutes after *Planned Parenthood,* 54 U.Det.J.Urban L. 127, 162–63. Although the author argues that the age of fertility should be the test of maturity for minors in this area, the author concedes that "notification or consultation might not even be categorized as regulation at all, the ultimate decision being left in the minor and her physician. Id. at 163.

Cf., *Roe v. Rampton,* 394 F.Supp. 677 (D.Utah 1975), *affirmed,* 535 F.2d 1219 (10th Cir. 1976),

in which a three-judge court (Ritter, C. J., dissenting) abstained in a constitutional challenge to a Utah statute which provided in part: "To enable the physician to exercise his best medical judgment, he shall . . . [n]otify, if possible, the parents or guardian of the woman upon whom the abortion is to be performed, if she is a minor . . . ." Utah Code Ann. § 76–7–304(2) (Supp.1975).

20. Opinion issued March 7, 1977, at 23–26.

the person as a supervisor in this field. Upon the written request of a pupil or the pupil's parent or guardian, a pupil shall be excused, without penalty or loss of academic credit, from attending classes in which the subject of reproductive health is under discussion.

M.C.L.A. § 380.1507(3):

A pupil shall not be enrolled in a class in which the subjects of family planning or reproductive health are discussed unless the pupil's parent or guardian is notified in advance of the course and the content of the course and is given a prior opportunity to review the materials to be used in the course [and is notified in advance of his right to have the pupil excused from the class]."

As can be seen, this proposed statute, already approved by the Michigan legislature, reaffirms parental rights to be notified and be consulted when the issue of birth control is raised. Defendant, therefore, cannot argue that the surreptitious distribution of *prescriptive* contraceptives is consistent with the general policy of Michigan law.

The policy sought to be enforced by the state here is for the sake of those minors capable of mature decisions in this area who might be inclined not to utilize the state agency's services if parental notification were required. The same policy, on the other hand, is to the detriment of those minors who would benefit from such a requirement, and is at the expense of the parental, familial, and religious rights here invaded. To uphold such a policy would be, to this court, to sustain precisely the type of "unwarranted governmental intrusion" into matters fundamentally affecting the prerogatives and responsibilities of parents in our society which the Supreme Court proscribed in the context of contraceptive availability for adults in *Eisenstadt.*

I, therefore, reaffirm and readopt the previous opinion and order of this court entered on March 7, 1977.