William BAIRD, Mary Moe, Parents Aid Society, Inc., Gerald Zupnick, M. D. and all others similarly situated, Plaintiffs,

v.

Francis X. BELLOTTI, Attorney General of the Commonwealth of Massachusetts, Garrett Byrne, District Attorney of the County of Suffolk, the District Attorneys for all other Counties, their agents, successors, those acting in concert with them, and all others similarly situated, Defendants,

Jane Hunerwadel, Defendant-Intervenor.

Civ. A. No. 74–4992–F.

United States District Court,
D. Massachusetts.

May 2, 1978.

---

10. 321 U.S. at 627, 64 S.Ct. at 729.

Joseph Balliro, Joan Schmidt, Boston, Mass., for plaintiffs.

Garrick F. Cole, Michael Meyer, Thomas R. Kiley Asst. Attys. Gen., Boston, Mass., for defendants.

Brian Riley, Boston, Mass., for defendant-intervenor. .

John H. Henn, Foley, Hoag & Eliot, Boston, Mass., amicus curiae.

Before ALDRICH, Senior Circuit Judge, JULIAN, Senior District Judge, and FREEDMAN, District Judge.

## OPINION

ALDRICH, Senior Circuit Judge.

### Introduction

This is the third time that this class action involving the constitutionality of a Massachusetts statute defining procedures that must be followed before a minor can obtain an abortion,[1] has required a full

---

1. The entire statute has been printed in other opinions. The section presently pertinent is Mass.G.L. c. 112, § 12S.

"(1) If the mother is less than eighteen years of age and has not married, the consent of both the mother and her parents is required. If one or both of the mother's parents refuse such consent, consent may be obtained by order of a judge of the superior court for good cause shown, after such hearing as he deems necessary. Such a hearing will not require the appointment of a guardian for the mother.

"If one of the parents has died or has deserted his or her family, consent by the remaining parent is sufficient. If both parents have died or have deserted their family, consent of the mother's guardian or other person having duties similar to a guardian, or any person who had assumed the care and custody of the mother is sufficient."

opinion.[2] It has been extensively prepared and briefed. Defendants[3] commence their most recent brief with this statement.

"With the exception of the Watergate scandal and the Viet Nam war, no issue has divided the country and its governmental officials more dramatically than the debate over the propriety of physicians' performing procedures to induce the termination of pregnancies, or, as they are commonly referred to, abortions. The sparks of this controversy have fallen on all levels of government and flamed into judicial conflagrations involving additional and difficult issues of federalism, the legal process, and the relations among the state, the family, and the family's individual members."

Although we might question how far the Watergate scandal divided the country, and we are unaware of any body of judicial disagreements warranting the description of conflagrations, we agree with the rest of this statement. We do not construe it as an admonition directed to our personal conduct. However, we do accept it as a guide for ourselves in choosing the path we should tread. At the same time, we believe that the Massachusetts legislature should govern itself with the same understanding. When dealing with relatively unimportant and uncontroversial matters the state can paint with a broad brush. When entering an area of highly cherished rights and principles, where the sparks, to use defendants' word, are charged because of basic, conflicting and deeply held beliefs, the state should proceed with corresponding care. We do not find that it has done so. Nor do we agree with defendants that this is a case of parties seeking relief for overbreadth improperly affecting others, not before the court. Cf. *Young v. American Mini Theatres, Inc.*, 1976, 427 U.S. 50, 59, 96 S.Ct. 2440, 49 L.Ed.2d 310; *Broadrick v. Oklahoma*, 1973, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830. Plaintiffs are asserting defects in their own right.

The first question is what the statute means. Basically, it requires a minor under 18, unless married, widowed or divorced, who desires an abortion, to obtain the written consent of both parents, unless unavailable, and failing that, the approval of a judge of the superior court, upon a finding of "good cause." Although there are some additional questions, there were three principal areas of disagreement as to the more precise statutory meaning; the right of parents, in withholding consent, to consider interests other than the minor's, *i. e.*, their own, and that of the family as a whole (parents' rights); the power of the court to order an abortion without the parents' knowledge in appropriate instances (parents' bypass); the power of the court to override the informed consent of a mature minor (judicial override). At the original hearing defendants and all members of the court agreed that the statute recognized parents' rights as well as the minor's, and forbade any parent bypass. Our dissenting brother felt, mistakenly, as it turned out, that the informed consent of a mature minor could not be overridden by the superior court. The court majority considered the statute unconstitutional in any event, and rejected his suggestion that we refer its meaning to the Massachusetts Supreme Judicial Court.

On appeal to the Supreme Court defendants changed their position in a number of respects. They abandoned parents' rights; they asserted that parents must regard only

---

**2.** For our prior opinions enjoining the statute's operation *see Baird v. Bellotti*, D.Mass., 1975, 393 F.Supp. 847, (*Baird I*,) *Baird v. Bellotti*, D.Mass., 1977, 428 F.Supp. 854, (*Baird II*.) *Baird I* contains many basic facts, including identification of the plaintiffs, standing, and justiciability, not repeated herein.

**3.** Defendants are Francis X. Bellotti, Attorney General of the Commonwealth, and the District Attorneys of the several Massachusetts coun-

ties. Jane Hunerwadel, mother of minor daughters, was permitted to intervene as the representative of parents of Massachusetts minors who might wish to obtain abortions without parental knowledge or consent. In addition, we accepted Planned Parenthood League of Massachusetts, Crittenden Hastings Clinic, and Preterm, in a status something more than amici because of reservations about the adequacy of plaintiffs' representation.

the minor's interests in considering whether to consent, and asserted, further, that the statute permitted court proceedings without the parents' knowledge if in the minor's best interests. Finally, they agreed with our dissenting brother that the statute recognized the mature minor rule and that there could be no judicial override in such event. The Supreme Court, without reaching the constitutional questions, but on the basis of the Massachusetts Attorney General's interpretation, which, it said, deserved special consideration, 428 U.S. at 143, 96 S.Ct. 2857, stated that, so read, the Massachusetts statute might differ fundamentally from the Missouri statute struck down in *Planned Parenthood of Central Missouri v. Danforth*, 1976, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788. Accordingly, it instructed us to refer the matter of construction to the Massachusetts court. *Bellotti v. Baird*, 1976, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844.

Hypothesizing the interpretation that defendants urged upon it, the Supreme Court said,

"The picture thus painted by the respective appellants is of a statute that prefers parental consultation and consent, but that permits a mature minor capable of giving informed consent to obtain, without undue burden, an order permitting the abortion without parental consultation, and, further, permits even a minor incapable of giving informed consent to obtain an order without parental consultation where there is a showing that the abortion would be in her best interests. The statute, as thus read, would be fundamentally different from a statute that creates a 'parental veto.'" 428 U.S. at 145, 96 S.Ct. at 2865.[4]

In other words, the Court envisaged a mature minor rule, with no power in the superior court to override, and which permitted parents' bypass altogether if the court found an informed consent, and even as to an immature minor if the court found that an abortion without her parents' knowledge would be in her best interests.

Pursuant to our instructions, we certified nine questions to the Massachusetts court and, in the meantime, continued the stay of the statute's enforcement. *Baird II.* Thereafter we received our answers. *Baird v. Attorney General*, 1977 Mass. A. S. 96, 360 N.E.2d 288. The Massachusetts court there rejected the concept of parents' rights, holding that parents may consider only the minor's personal interests in deciding whether to consent. However, the court also construed the statute to be in some respects radically different from that envisaged by the Supreme Court. The court held that there could be no parents' bypass in any case. Further, it held that the statute eliminated abortions altogether from the mature minor rule. We address the constitutional issues raised by those holdings in that order.

*1. Parents' Bypass: The statute's absolute requirement of parental notification.*

The Massachusetts court determined that the legislature was "explicit in stating that a judge should pass on an application for a consent order only after one or both parents have declined to consent to the abortion." 360 N.E.2d at 294. Faced with the loss of this alleviating feature, defendants now take the position that there are not enough cases calling for an exception to mandatory consultations.[5]

---

**4.** In referring to *Baird* in *Maher v. Roe*, 1977, 432 U.S. 464, 473, 97 S.Ct. 2376, 53 L.Ed.2d 484, the Court omitted part of the material in this paragraph. Defendants contend that by so doing the Court has limited the *Baird* decision and, consequently, the issues before us. We cannot think *Baird* was intended to be overruled or modified by an abbreviated summary, and we mention this point only because of the stress defendants lay upon it.

**5.** Alternatively, defendants contend that "the proper decision would determine that the statute is valid on its face and leave for individual or aggregate 'as applied' litigation the resolution of problems affecting individual 'mature minors.'" We regard this argument as specious. Unless we act, the statute will have to be "applied" by the superior court as the Massachusetts court has held it is to be applied, *viz.*, by refusing to take jurisdiction until the parents have been notified.

Defendants commence with a number of mistaken assumptions. In the first place, they apparently misread the language of the Supreme Court's opinion, quoted ante, and think the Court was contemplating parents' bypass only when there was affirmative proof that this would be in the minor's best interests. We read the Court's language as indicating it understood defendants' contention to be that bypass would be in order in every case that the superior court found informed consent by a mature minor. The evidence warrants our findings that many, perhaps a large majority of 17-year olds are capable of informed consent, as are a not insubstantial number of 16-year olds, and some even younger.

■ In addition, the Court recognized that even if incapable of informed consent, it may be to a minor's best interest that the hearing be held, and the abortion be performed, without her parents' knowledge. The immature minor may be, in fact, the least capable of dealing with a hostile family situation. We reject defendants' singular contention that the issue of immature minors is not before us.[6]

Finally, in an apparent attempt to minimize the importance of the statute's defects, defendants' post-trial brief contains a graphic diagram prepared by counsel, divided into trimesters, and again subdivided, from which they conclude that plaintiffs' total complaint relates to only "one-twenty-fourth of the situations which the statute encompasses." Not only does this fractionalization disregard the points just made, but it overlooks the fact that a minor's possible need of an abortion without her parents' knowledge is not limited to the first trimester. However, even were the issues confined to the first trimester, the great majority of abortions occur in the earlier months. Defendants' giving equal numerical weight to each trimester is fanciful.

■ Coming to the merits, and passing for the moment the separate issue of mature minors, there are a variety of recognized reasons why it would be to a minor's best interests for one or both of her parents to be kept in ignorance of her pregnancy. Parents, physically or emotionally unwell, may be injured by the shock, thus causing the minor deep feelings of guilt. Some parents are child abusers; others at least may become actively hostile on such disclosure. Defendants concede, and the evidence shows, that an appreciable number of parents are not supportive. These include not only those who would inflict physical harm, but parents who would insist on an undesired marriage, or on continuance of the pregnancy as punishment. We may suspect, in addition, that there are parents who would obstruct, and perhaps altogether prevent, the minor's right to go to court. This would seem but a normal reaction of persons who hold strong anti-abortion convictions.

The Massachusetts court conceded that there is no penalty for improperly withheld consent. From the parents' standpoint, the court was correct, but from the minor's, manifestly it is not. We begin with the testimony of defendants' expert that a substantial number of minors would refuse to consult with their parents under any circumstances. Assuming, however, that they did consult and that the parents improperly refused to consent, the penalty borne by the minor—the burden of seeking a court order—is a heavy one. Plaintiffs' expert credibly and without contradiction testified that court proceedings over such a personal matter, even if conducted in the most benign manner, would be "severely detrimental to a teenager, particularly since she had just met with her parents' disapproval, which is difficult enough." Further, she credibly testified that many minors would not go to court, especially if it had to be against her parents, but rather would resort

---

**6.** Defendants also contend that plaintiffs waived the subject of immature minors. It is not clear that they did so, but, if they did, it was a breach of their duty as representatives of the classes that at least Dr. Zupnick purported to represent, and we are not bound thereby. It was for such reasons that we gave special stature to the parties we would ordinarily have considered only amici.

to illegal and frequently dangerous abortions. But assuming again in the statute's favor that the minor would initiate the proceedings, defendants' own expert expressed the opinion that if she did go to court and was successful, it would be likely to destroy what was left of the family relationship.[7] The minor, accordingly, is in a no-win situation. If she loses the judicial proceedings, it will be a personal blow, and scarcely a redemption of the ill feeling and tension that undoubtedly resulted from her parents' refusal of consent and her taking them to court. If she wins, according to defendants' own expert she is likely to find herself in an even worse position.

On this basis plaintiffs contend with some persuasiveness that the entire concept of a court proceeding to remedy the unconstitutionality of the parental veto, as struck down in *Danforth*, is but an ignis fatuus, and itself imposes too great a burden upon the exercise of the minor's rights. We do not reach this issue, but we do hold that it is an improper burden in those cases where a court, if given free rein, would find that it was to the minor's best interests that one or both of her parents not be informed, but is forbidden by the statute to make this decision. In remanding the case to us the Supreme Court said,

> "We do not accept appellees' assertion that the Supreme Judicial Court of Massachusetts inevitably will interpret the statute so as to . . . require the superior court to act other than in the best interests of the minor . . .."
> 428 U.S. at 147, 96 S.Ct. at 2866.

However, in reading the statute as requiring parental notification in every instance,

the Massachusetts court has done precisely that.

Defendants would answer this by claiming that this defect is not "real and substantial," *Young v. American Mini Theatres, Inc.*, ante, 427 U.S. at 60, 96 S.Ct. 2440, or "substantial . . . in relation to the statute's plainly legitimate sweep," *Broadrick v. Oklahoma*, ante, 413 U.S. at 615, 93 S.Ct. at 2918. However, in another connection, but equally applicable here, their brief refers to "legislative recognition of the unfortunate fact that parents are not always supportive of their pregnant daughters and may, the evidence suggests infrequently, refuse to consent to the performance of abortion surgery although the surgery is in their child's best interests, or mistreat her in other ways." If there is legislative recognition of this unfortunate fact in one connection, there is no reason why there should not be in another. In terms of the direct concern of this statute, the exact number of minors who are injured is unimportant. Particularly is this so when there is no practical reason for not protecting them. Practicality, in some cases, may justify overbreadth, but since, under the Massachusetts court's holding, the superior court in any event must determine the minor's best interests in the light of all her personal circumstances, it opens no new areas to inquire into her family situation.

We add that it is peculiarly incorrect, and inappropriate, for defendants to express alarm by saying that "plaintiffs' overbreadth claim is an unwarranted use of an engine of destruction whose acceptance would destroy the entire statute." If the statute is overbroad because it fails to protect the interests which are its sole justifi-

---

7.  "It seems to me that when affairs have reached this point where the relationship between the parents and the child have become a courtroom issue that I would have a lot of misgivings about the validity of the relationship between the parents and the child and how capable they are of being valid support for this child in the future.

> .  .  .  .  .

"The consequences, if the decision was made in favor of the child, for quality family relationships are not good. The need for support on the part of the child would be

abandoned at this point and the child would be abandoned at this point and her need for support would be great . . .."
This last sentence may have been inartistically expressed, or inaccurately transcribed, but, however it was said, we reject defendants' contention that their witness made "clear it is not judicial intervention but rather the underlying family crisis which prompts his dim prognosis." To the contrary, it is apparent that he felt a judicial proceeding, particularly if successful, might be the final blow.

cation, there is a simple solution—the legislature can remedy the defect.

We cannot leave this matter without commenting briefly on the superlatives that intervenor Hunerwadel attached to the value of requiring parental notification in order to obtain parental support, and to permit parental guidance. We in no way minimize the importance of these matters.[8] Parents have many years, however, to offer guidance, and to indicate support. However surprised an individual parent may be to find a daughter pregnant, given the present high incidence of teenage pregnancy the possibility seems too great for concerned parents to disregard until it happens. If the family relationship is such that communication has not been attempted, or successful, before the pregnancy, we agree with the expert who doubted the efficacy of a last-minute, state-compelled consultation. What is more important, if the minor, too, doubts it, a statute that requires her to go to her parents as a precondition to going to court will not tie her hands. Rather, it will lead her to the illegal abortionists that defendants rightly decry, or to other dangerous activity. The minor may, of course, be mistaken, but we do not believe the answer to this is a judicial proceeding preconditioned on her finding out, for the die has then been cast.

### 2. Judicial Override: The mature minor and unequal protection.

Not only under this statute must every minor, irrespective of her achievement of maturity sufficient to reach an informed consent, notify her parents and seek their consent before going to court, but she must submit to the court's decision if it does not conform to her own. Defendants represented to the Supreme Court that Massachusetts recognized the mature minor rule and that if the court found an informed consent, it would proceed to issue the order.

The Massachusetts court held that defendants had misread the statute; that Massachusetts did have the mature minor rule, but that the statute rejected it with respect to abortions. It went on to state that, but for the statute, the mature minor rule would permit an informed consent "where the best interests of a minor will be served by not notifying . . . her parents." 360 N.E.2d at 296. Thus the statute not only requires the parents to be notified, but deprives the minor of the right to decide even when the court has found her mature and that her decision was informed. Instead, the state, acting through the judge, substitutes its own view. It does so even in light of the testimony, which we credit, that in addition to the loss of her rights, it is a highly traumatic experience for a mature minor to be refused a desired abortion.

A minor has a basic constitutional right to an abortion. *Roe v. Wade*, ante; *Carey v. Population Services International*, 1977, 431 U.S. 678, 692–94, 97 S.Ct. 2010, 52 L.Ed.2d 675; *Planned Parenthood of Central Missouri v. Danforth*, ante, 428 U.S. at 74–75, 96 S.Ct. 2831. The state's power to limit this right should extend only to protect the minor from the special consequences of her minority—immaturity, and the lack of informed understanding. Instead, the statute imposes upon the minor the very disability which has been found not to exist, and does so uniquely in the area in which the Court has determined she has constitutional rights.

An account of the Massachusetts law as to mature minors is fully set forth in the opinion of the Massachusetts court, and need not be repeated. Except for sterilization, a far more serious and far-reaching procedure, abortion is the only form of surgery to which a mature minor may not consent, although the evidence shows that many other forms are far more complicated

---

8. We also note that Justice White's opinion in *Danforth* referred to parental consent as "the traditional way by which States have sought to protect children from their own immature and improvident decisions." 428 U.S. at 95, 96 S.Ct. at 2853. The Justice was speaking, how-

ever, in terms of a statute under which parents made the final decision. Where there is to be a judicial determination, it would be counter-productive to include the parents when the court finds that their knowledge and presence would be detrimental.

and dangerous. Defendants, in dwelling upon the dangers of abortion, proceed as if the only issue were to abort or not to abort, neglecting the fact that the choice necessarily involves a further alternative. The evidence fully supports the conclusion stated in *Roe v. Wade*, ante, 410 U.S. 113 at 149, 93 S.Ct. 705, 35 L.Ed.2d 147, that continued pregnancy and childbirth involve greater risks than a properly performed first trimester abortion. Nor are we speaking only as to physical dangers. The same comparative findings with respect to abortion as against continued pregnancy apply to the psychological risks as to the physical. We find no reasonable basis for Massachusetts distinguishing between a minor and an adult, given a finding of maturity and informed consent.[9] Even the Massachusetts court stated that this is an area particularly appropriate for the mature minor role. 360 N.E.2d at 296. We regard the legislative exception to be both an undue burden in the due process sense, and a discriminatory denial of equal protection.

### 3. *Formal overbreadth.*

█ Not only has the statute, with the exception of parents' rights, been found to possess none of the features which defendants persuaded the Court might distinguish it from the Missouri statute condemned in *Danforth*, but we believe it improperly suggests the existence of parents' rights. Defendants, realizing that extending rights to parents that may conflict with a minor's own interest was improper under *Roe v. Wade*, abandoned the position that the statute recognized them in their arguments before the Supreme Court and the Massachusetts court, and the latter, pursuant to the need to construe the statute constitutionally, accepted that construction. We agree with our dissenting brother that, generally, a limiting construction of an otherwise unconstitutional state statute by a state court is read into the statute, and can save it, if the construction itself is constitutional. In this case, however, involving as it does a

most sensitive area, where the statute will be read, and applied, primarily by laymen, we think that a limiting judicial construction is insufficient to cure the impermissible chill which its excessively broad language creates. It is only reasonable to anticipate that many parents, accustomed to think in terms of parents' rights, will find them included for the very reasons originally argued by the defendants and accepted by us. Clearly they will do so if they are unaware of the limitations which the court read into the statute. We do not share our brother's optimism that every parent who knows of the statute will be equally cognizant of the court's interpretation. Such knowledge is a legal presumption, not a factual one. Moreover, it is likely that some, even if aware of the court's opinion, will choose the language of the legislature over judicial limitations they regard as an unwarranted usurpation. We may take judicial notice, from public reaction we have seen to *Roe v. Wade*, that an appreciable segment of the public holds such views.

In light of the very heavy burden that the statutorily required judicial proceeding imposes upon a minor, we regard it essential that the limited scope of the issue confronting parents, when considering whether to consent, be brought home as forcefully, and precisely, as possible, to minimize the incidence of improper refusals. Since there is no justification for the statute's failure to do this, the shadow it casts is an undue burden upon the minor's rights. *See Maher v. Roe*, ante, 432 U.S. at 473, 97 S.Ct. 2376; *Bellotti v. Baird*, ante, 428 U.S. at 147, 96 S.Ct. 2857. Arguably, it is a welcomed shadow. Whatever may have been the legislature's original intent, we observe that it re-enacted the statute, without amendment, in 1977 Mass.Acts ch. 397, not only after the Supreme Court had indicated what might pass constitutional muster, but after the Massachusetts court had disclosed this apparent overbreadth, and we had commented, in *Baird II*, on its chilling effect.

---

9. Nor, parenthetically, has any reason been advanced for attaching to abortion the special requirement of dual consent by both parents.

Rather, this provision seems a further manifestation of our originally found intent to recognize parents' rights.

The statute is a prominent public issue, and we cannot think the legislature was unaware of its judicial course. Under these circumstances it may be thought that the legislature prefers the chilling effect rather than to have the statute expressed in "terms that the ordinary person exercising ordinary common sense can sufficiently understand." *United States Civil Service Commission v. National Ass'n of Letter Carriers*, 1973, 413 U.S. 548, 579, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796. This, in turn, evokes the statement of the Court in *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 1977, 429 U.S. 252, 265–66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450, "When there is proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified." This response seems particularly warranted when the overbreadth serves no other purpose.

*Judicial Repair.*

██ The Massachusetts court, although recognizing that its function was to construe the statute and not to determine its constitutionality, did read a substantial limitation into a portion of the language in an effort to make the parental consent provision constitutional. The court did not, however, read into the statute the exceptions the Supreme Court had indicated would make a fundamental difference and might save it from constitutional infirmity. Instead, in these respects it read the statute the other way, but purported to give it a chameleon-like ability to adjust to whatever color should ultimately be necessary to protect it. While saying that the statute "is explicit in stating that a judge should pass on an application . . . only after one or both parents have declined to consent," 360 N.E.2d at 294, nonetheless this requirement is subject to alteration.

> "If the Supreme Court concludes that we have impermissibly assigned a greater role to the parents than we should or that we have otherwise burdened the minor's

choice unconstitutionally, we add as a general principle that we would have construed the statute to conform to that interpretation." *Id.* at 292,

. . . . .

> "[The statute] must be construed to require as much parental consultation as is permissible constitutionally. In such a situation, the judge will have to determine whether circumstances exist which make prior parental consultation impermissible constitutionally." *Id.* at 294–95.

How the judge is to have the opportunity to make such a determination, much less how a minor seeking an order will know he can do so, in the face of explicit language saying he cannot, the court did not explain.

Again, the court said,

> "The Legislature has left no room to apply a mature minor rule where an unmarried minor seeks an abortion without parental consultation." *Id.* at 294.

However, this, too, can be changed, "[if] a contrary conclusion is compelled constitutionally." *Id.* at 293.

This perceived adaptability presents a number of problems. It is commonly said that a statute is to be given a constitutional construction "if fairly possible," *Crowell v. Benson*, 1932, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598, "when a limiting construction . . . could be placed," *Broadrick v. Oklahoma*, ante, 413 U.S. at 613, 93 S.Ct. at 2916. Here something more is involved than construing language. The Massachusetts court, in addition to contradicting its specific terms, suggests reading into the statute affirmative provisions made out of nothing but a generally announced purpose to pass constitutional muster.[10] In so doing, the court seems to have found the ultimate remedy for all constitutional infirmities. If a statute which, in terms, requires parental consultation without exception, can be "construed to require as much parental consultation as is permissible constitutionally," here, at once, is an instant

---

10. Although the Massachusetts court, and the defendants, speak of severability, such action is not severance. Severability is a process of

striking out, not of insertion or rewriting. *See United States v. Reese*, 1875, 92 U.S. 214, 221, 23 L.Ed. 563.

cure, both for overbreadth, and for lack of standards. Regardless of whether a statute says too much, or too little, so long as the legislature intended it to be constitutional, when it comes before a court it will be appropriately rewritten. With due respect, we cannot believe this to be possible. *Cf. United States v. Reese,* 1875, 92 U.S. 214, 221, 23 L.Ed. 563.

The situation is even more undesirable. Although the statute is not ours, the Massachusetts court has, in effect, given us the coloring-book. The Supreme Court remanded the case for construction by the Massachusetts court because "in the absence of an authoritative construction, it is impossible to define precisely the constitutional question presented." 428 U.S. at 148, 96 S.Ct. at 2866. Now, apparently, the question supplies the answers. This is an approach which, so far as we can ascertain, is unique. While it is ultimately, of course, for the Supreme Court, we must doubt our authority to fix terms of a state statute contrary to the prima facie interpretation given it by the state court. *See United States v. Thirty-seven Photographs,* 1971, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822.

We reaffirm our decision that the statute is unconstitutional and is to be permanently enjoined. Plaintiffs are entitled to costs, including recovery of costs paid as a result of the previous appeal, lost because of defendants' mistaken advocacy.

JULIAN, Senior District Judge (dissenting):

After the first trial the majority of this three-judge court held Mass.G.L. c. 112, § 12P unconstitutional because of its requirement of parental consent to a minor's abortion and permanently enjoined the defendants from enforcing it "in any fashion."

I dissented. The majority and dissenting opinions are reported in 393 F.Supp. 847, at pages 849 and 857 respectively.

The defendants appealed. The Supreme Court vacated the judgment of the District Court and remanded the cases [1] for proceedings consistent with the Supreme Court's opinion holding that the District Court should have certified to the Supreme Judicial Court of Massachusetts (hereinafter SJC) appropriate questions concerning the meaning of section 12P and the procedure it imposes.

The District Court accordingly certified nine questions to the SJC which, after hearing arguments of counsel, answered all nine questions in an opinion filed January 25, 1977. *Baird v. Attorney General,* Mass., 360 N.E.2d 288.

This District Court thereafter held further hearings and received additional evidence, arguments and briefs in the case.

The District Court remains divided on the issue of the constitutionality of the statute as construed by the SJC in its answers to this Court's questions. The same two judges who had invalidated the statute have now reaffirmed their original decision and have held that section 12P (now section 12S) even as construed by the SJC is unconstitutional and ordered that enforcement of the statute be permanently enjoined.

I again dissent from their decision. I would hold the statute constitutionally valid except that part which as construed by the SJC in its answer to question 2(b) vests in the superior court judge the power to withhold consent to the abortion even though he finds that the minor "is capable of making, and has made, an informed and reasonable decision to have an abortion" but further "determines that the best interests of the minor will not be served by an abortion." *Id.,* at 293.

In 1974 the Massachusetts Legislature adopted Stat.1974, c. 706, entitled, "AN ACT TO PROTECT UNBORN CHILDREN AND MATERNAL HEALTH WITHIN PRESENT CONSTITUTIONAL LIMITS." Section 12P of that Act reads as follows:

---

1. *Bellotti v. Baird,* together with the companion case, *Hunerwadel v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976).

"(1) If the mother is less than eighteen years of age and has not married, the consent of both the mother and her parents is required. If one or both of the mother's parents refuse such consent, consent may be obtained by order of a judge of the superior court for good cause shown, after such hearing as he deems necessary. Such a hearing will not require the appointment of a guardian for the mother.

"If one of the parents has died or has deserted his or her family, consent by the remaining parent is sufficient. If both parents have died or have deserted their family, consent of the mother's guardian or other person having duties similar to a guardian, or any person who had assumed the care and custody of the mother is sufficient.

"(2) The commissioner of public health shall prescribe a written form for such consent. Such form shall be signed by the proper person or persons and given to the physician performing the abortion who shall maintain it in his permanent files.

"Nothing in this section shall be construed as abolishing or limiting any common law rights of any other person or persons relative to consent to the performance of an abortion for purposes of any civil action or any injunctive relief under section 12R."

The nine questions certified to the SJC and its answers are as follows:

"1. What standards, if any, does the statute establish for a parent to apply when considering whether or not to grant consent?

"a) Is the parent to consider 'exclusively . . . what will serve the child's best interest'?

"b) If the parent is not limited to considering exclusively the minor's best interests, can the parent take into consideration the 'long-term consequences to the family and her parents' marriage relationship'?

"c) Other?"

The SJC gave this answer (360 N.E.2d at p. 292):

"This question concerns the standard which should be applied by a parent in deciding whether to consent to an abortion for his or her unmarried daughter. The statute provides no explicit standard. . . . In light of the Court's opinion in *Planned Parenthood of Cent. Mo. v. Danforth* [428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976)] abrogating an absolute parental veto, we construe § 12P so as to avoid any constitutional question, as far as possible, and answer that the parent is to consider 'exclusively . . . what will serve the child's best interest.' We thus answer question 1(a) in the affirmative and need not answer questions 1(b) and 1(c)."

"2. What standard or standards is the superior court to apply?

"a) Is the superior court to disregard all parental objections that are not based exclusively on what would serve the minor's best interests?

"b) If the superior court finds that the minor is capable, and has, in fact, made and adhered to, an informed and reasonable decision to have an abortion, may the court refuse its consent based on a finding that a parent's, or its own, contrary decision is a better one?

"c) Other?"

The SJC answered as follows (360 N.E.2d at page 293):

"Section 12P provides that if one or both of the minor's parents refuse consent, 'consent may be obtained by order of a judge of the superior court for good cause shown . . . .' Here there is a statutory standard of 'good cause.' The second question inquires concerning the role of the judge in applying the 'good cause' standard. We think it clear, answering question 2(a), that the same considerations referred to in answering question 1 must be applied by a judge of the Superior Court. He must disregard all parental objections, and other considerations, which are not based exclusively on what would serve the minor's best interests. . . . '[G]ood cause' means that

the judge may give consent to an abortion where it is shown that, in spite of the disapproval of one or both parents, the best interests of the minor will be served if the abortion is performed. In granting consent, the judge, of course, may impose reasonable conditions which will protect those best interests."

Answering question 2(b), the SJC stated: "Unless a contrary conclusion is compelled constitutionally, we do not view the judge's role as limited to a determination that the minor is capable of making, and has made, an informed and reasonable decision to have an abortion. Certainly the judge must make a determination of those circumstances, but, if the statutory role of the judge to determine the best interests of the minor is to be carried out, he must make a finding on the basis of all relevant views presented to him. We suspect that the judge will give great weight to the minor's determination, if informed and reasonable, but in circumstances where he determines that the best interests of the minor will not be served by an abortion, the judge's determination should prevail, assuming that his conclusion is supported by the evidence and adequate findings of fact."

"3. Does the Massachusetts law permit a minor (a) 'capable of giving informed consent,' or (b) 'incapable of giving informed consent,' 'to obtain [a court] order without parental consultation'?"

The SJC answered (360 N.E.2d at 296) that "[p]arental consultation for an abortion is required by statute in all cases, other than in an emergency or where there is no parent (or the equivalent) available."

"4. If the court answers any of question 3 in the affirmative, may the superior court, for good cause shown, enter an order authorizing an abortion, (a), without prior notification to the parents, and (b), without subsequent notification?"

The SJC answered (360 N.E.2d at 297) that "[i]f they are available, the parents of a minor must be notified of any proceeding brought by her to obtain judicial consent to an abortion and will be entitled to participate. . . . We say that, apart from constitutional restraints, notification to the parents of the judicial proceeding, in advance if possible, is required, and thus we answer question 4 in the negative. We recognize that there may be instances in which the parents are unavailable and the judge must act. In such a case, consultation is impossible, but subsequent notification of the proceeding may not be. Unless barred by constitutional considerations, notification of a minor's parents concerning judicial proceedings is required."

"5. Will the Supreme Judicial Court prescribe a set of procedures to implement c. 112, § 12P which will expedite the application, hearing, and decision phases of the superior court proceeding provided thereunder? Appeal?"

The SJC answers the first portion of question 5 in the affirmative (360 N.E.2d at pp. 297–298):

"Prompt resolution of a § 12P proceeding may be expected. On any court day, hardly any person in the Commonwealth [of Mass.] is more than one or two hours' travel from a court house where a Superior Court judge is available to process an application under § 12P. The proceeding need not be brought in the minor's name and steps may be taken, by impoundment or otherwise, to preserve confidentiality as to the minor and her parents."

The SJC details the procedures available to expedite the proceedings:

"At each stage, a record of the proceedings will be preserved."

With reference to the second portion of question 5, which concerns the prospect of expeditious appeals, the SJC states that it had

"no question concerning the speedy disposition of any appeal."

"6. To what degree do the standards and procedures set forth in c. 112, § 12F (Stat.1975, c. 564), authorizing minors to give consent to medical and dental care in specified circumstances, parallel the grounds and procedures for showing good cause under c. 112, § 12P?"

The SJC answered as follows (360 N.E.2d at p. 300):

"The grounds for consenting to an abortion under § 12P, which we have defined as the best interests of the minor, are not different from the standards to be applied in determining whether some other medical procedure should be performed on a minor pursuant to § 12F. In each instance, a physician must exercise his or her medical judgment and the minor must consent to the procedure as being in his or her best interests.

"The difference between § 12P, concerning an abortion, and § 12F, concerning other medical operations, lies in the procedures which must be followed in arriving at the conclusion that the particular operation will be in the best interests of the minor. Under § 12F, a married, widowed, or divorced minor may consent to any and all medical services without the intervention of either his or her parents or of a court. Thus, the requirements of § 12P concerning parental or judicial approval of an abortion are inapplicable to such minors. All other minors described in § 12F seeking abortions must pursue the procedures of § 12P, although they are free to consent to any other medical procedure (except sterilization) without the involvement of their parents or of a judge. Minors not described in § 12F have only their common law rights to consent to medical services, except as expanded or limited by statute."

"7. May a minor, upon a showing of indigency, have court-appointed counsel?"

The SJC answered this question as follows (360 N.E.2d at p. 301):

"If a judge of the Superior Court determines that the best interests of an indigent minor would be served by the appointment of counsel to represent the minor, the court has the power to appoint counsel for the minor to assist her in the assertion of her constitutional rights. . . . If the mere existence of the 'burden' of seeking judicial consent to an abortion is not unconstitutionally onerous (and apparently these plaintiffs have not yet so claimed in the District Court), the circumstances that an indigent minor may have counsel appointed for her lightens the 'burden' and tends to make the requirement more acceptable constitutionally. . . . In order to avoid a constitutional question concerning the burden on the assertion of a minor's constitutional rights which would arise from a contrary interpretation, we construe the statutes of the Commonwealth to authorize the appointment of counsel or a guardian ad litem for an indigent minor at public expense, if necessary, if the judge, in his discretion, concludes that the best interests of the minor would be served by such an appointment."

"8. Is it a defense to his criminal prosecution if a physician performs an abortion solely with the minor's own, valid, consent, that he reasonably, and in good faith, though erroneously, believed that she was eighteen or more years old or had been married?" [2]

The SJC answered question 8 in the affirmative (id., at p. 302):

"The fifth paragraph of § 12F . . . provides such a protection to a physician. Although § 12F is not concerned primarily with abortion procedures, the Legislature did not except abortions from the broad grant of protection of the fifth paragraph of that section, as it did exempt abortions from certain other provisions of § 12F. . . . A construction of § 12F which would not extend to physicians performing abortions the same protection extended to physicians performing other operations would raise a constitutional question which we avoid by the construction of § 12F which we have adopted."

"9. Will the Court make any other comments about the statute which, in its opinion, might assist us in determining

---

2. The SJC commented (n. 21, id., at p. 302): "The word 'valid' may not be an appropriate one in the context of the question."

whether it infringes the United States Constitution?"

The SJC points out that Rule 3:21 of that Court, which sets forth the certification procedure, "contemplates that only questions of law will be certified. Question 9 is not a question of law." The SJC, however, takes the opportunity under question 9 to comment on "the consequences of a determination that the differing procedures of § 12P and § 12F, as interpreted by us apart from the impact of constitutional considerations, do not survive an equal protection of the laws challenge." *Id.*, pp. 302, 303.

It is clear that the statute as construed by the SJC is designed to assure parental, and, if necessary, judicial involvement in the pregnant minor's decision to have an abortion. The magnitude, seriousness, and

urgency of the problem of teenage pregnancy and its consequences are generally acknowledged.[3] The Massachusetts Legislature had the power within constitutional limits to enact legislation it reasonably believed would tend to alleviate the problem in Massachusetts.

The majority rely on three arguments to hold the statute unconstitutional in its entirety. One of these arguments is that the statute's failure to inform parents that they must consider only the best interests of the minor in deciding whether to consent to their daughter's abortion constitutes a heavy burden on the exercise of her right to have an abortion because she would have to go to court in case of "an improper refusal of consent."[4] Parents, however, are not

---

3. "Adolescents in the United States have rates of childbearing that are among the world's highest." From plaintiffs' Exh. 2 ("11 Million Teenagers") at page 7.

"There are about 21 million young people in the United States between the ages of 15 and 19 years. Of these, more than half—some 11 million—are estimated to have had sexual intercourse—almost seven million young men, and four million young women. In addition, one-fifth of the eight million 13- and 14-year-old boys and girls are believed to have had intercourse." *Id.*, at page 9.

"Each year, more than one million 15–19-year-olds become pregnant, one-tenth of all women in this age group. (Two-thirds of these pregnancies are conceived out of wedlock.) In addition, some 30,000 girls younger than 15 get pregnant annually. . . . Of the additional 30,000 pregnancies experienced by girls younger than 15, 45 percent were terminated by abortion . . . .." *Id.*, at page 10.

As of June 1976 there were approximately the following numbers of female adolescents residing in Massachusetts by age:

| | |
|---|---|
| Ages 10, 11 and 12 | 166,500 |
| Ages 13 and 14 | 113,500 |
| Ages 15, 16 and 17 | 174,000 |
| TOTAL | 454,000 |

(Derived from answer to defendants' Request for Admission No. 1 under Rule 36, F.R.Civ.P.)

4. The majority are of the opinion that an improper parental refusal will impose on the minor the burden of going to court or the burden of seeking alternatives to a legitimate abortion. With regard to minors seeking alternatives to a legitimate abortion, the plaintiffs' witness admitted that it is impossible to have data on that. (Oct. 18, 1977, Tr. at 106.) The majority

accept plaintiffs' testimony that court proceedings would be severely detrimental to a teenager although the plaintiffs' expert admitted that she had never been to court with any of her minor patients and that she had been involved in fewer than five courtroom proceedings of any fashion. (Oct. 18, 1977, Tr. at pp. 100, 101.) A court appearance in this case was apparently not viewed as burdensome to Mary Moe I, the only minor who appeared before the court, since she "voluntarily participated" in the action. *Baird v. Bellotti*, 393 F.Supp. 847, 850, n. 5.

The majority opinion contains this statement (p. 1001): "We begin with the testimony of defendants' expert that a substantial number of minors would refuse to consult with their parents under any circumstances." The defendants' expert's testimony, however, was as follows (Oct. 18, 1977, Tr. at 148):

"Q. How about a pregnant adolescent? Do you have an opinion as to the extent to which a pregnant adolescent would be reluctant to discuss the matter of that pregnancy with her parents?

"A. I don't know what it is you are trying to get me to say. I would qualify your question by saying that at first contact adolescent girls are reluctant to discuss it with their parents.

"Q. Is it fair to say that with careful counselling a great number of those would then discuss it with their parents?

"A. Yes.

"Q. But there would still be a substantial number who would be reluctant to do so?

"A. Yes, sir."

Although the Supreme Court in *Bellotti v. Baird* did not reach the issue of whether a court hearing would be an impermissible burden on a minor's rights, of the five justices who held the

without notice of the standard to apply in deciding whether to consent to their daughter's abortion. The SJC's construction of the statute explicitly sets out the standard to be used: "the parent is to consider 'exclusively . . . what will serve the child's best interest.'" *Baird v. Attorney General*, 360 N.E.2d 288, 292 (1977). A construction by the state's highest court fixes the meaning of the statute. The "state interpretation is as though written into the ordinance itself," *Poulos v. New Hampshire*, 345 U.S. 395, 402, 73 S.Ct. 760, 765, 97 L.Ed. 1105 (1953); it "puts these words in the statute as definitely as if it had been so amended by the legislature." *Winters v. New York*, 333 U.S. 507, 514, 68 S.Ct. 665, 669, 92 L.Ed. 840 (1948). See *N.A.A.C.P. v. Button*, 371 U.S. 415, 432, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Commonwealth v. Richards*, Mass., 340 N.E.2d 892, 894 (1976). A state court construction of a statute is notice to all concerned of what the statute provides. See *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (by implication).

The majority anticipate that many parents will mistakenly find parents' rights included in the language of the statute, but they give no reason for assuming that many parents will be familiar with the language of the statute and not assuming the same familiarity with the SJC's construction of the statute. If we are to assume that many parents are sufficiently informed to have knowledge of the exact language of the statute, it is reasonable to assume that they would also be informed of the statute's construction.[5] In any case, the construction

of the statute is now part of the law and it is a general rule of law that all persons are presumed to have notice of all that the law contains. The statute as construed unequivocally states that parents are to consider only the minor's best interests. It is hard to imagine how this could be stated more clearly.

The majority attribute to the Legislature the deliberate intent to make the statutory language imprecise because the 1977 re-enactment of the statute failed to spell out the standard for parental consent defined by the SJC. This argument appears to be wholly without merit. The purpose of the 1977 re-enactment was to make corrective changes in the numbering of the sections of the statute. At the time of the original enactment of the statute on abortion, there were already in existence statutory sections with the same numbering as the abortion sections. See *Bellotti v. Baird*, 428 U.S. 132, 134, n. 1, 96 S.Ct. 2857, 49 L.Ed.2d 844. In 1977 the Legislature merely corrected this duplication by enacting the statute with different numerical designations. No changes in substance were made. In view of the purpose of the re-enactment, the majority finding that the Legislature "welcomed" imprecision is inaccurate. In fact, if any intention regarding the meaning of the statute is to be attributed to the Legislature's re-enactment, it must be that the Legislature intended the judicial construction to be part of the statute. "It is a well-settled rule of statutory interpretation that, when a statute after having been construed by the courts is re-enacted without

parental consent requirement unconstitutional in *Planned Parenthood, infra*, two indicated that they would approve of a statute which contained provisions for a court proceeding. "[A] materially different constitutional issue would be presented under a provision requiring parental consent or consultation in most cases but providing for prompt (i) judicial resolution of any disagreement between the parent and the minor, or (ii) judicial determination that the minor is mature enough to give an informed consent without parental concurrence or that abortion in any event is in the minor's best interest." *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 91, 96 S.Ct. 2831, 2851,

49 L.Ed.2d 788 (1976) (Stewart, J., with Powell, J.).

This court has already ruled that for purposes of this facial attack the question of burdensome court procedures is a non-issue. "[W]e rule now that we will conclusively assume, for the purposes of our decision, utmost speed, diligence, and proper procedure and consideration, including protection of privacy by the Superior Court and an Appellate Court." (Apr. 13, 1977, Hearing Tr. at p. 3.)

**5.** On vital issues, such as those relating to abortion and adolescents, decisions of the SJC have substantially the same dissemination and publicity as legislative enactments.

**1012**

material change, by the Legislature, it is presumed to have adopted the judicial construction put upon it." *Nichols v. Vaughan*, 217 Mass. 548, 551, 105 N.E. 376, 378 (1914); *Commonwealth v. Benoit*, 346 Mass. 294, 297, 191 N.E.2d 749 (1963); *Lorillard v. Pons*, 434 U.S. 866, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). Thus, the statute contains legally sufficient notice that parents are to consider only the best interests of their child.

Another reason relied upon by the majority in holding the statute unconstitutional is that the statute has an absolute requirement of parental notification and that there are reasons why it could be in a minor's best interests for her parents to be kept in ignorance of her pregnancy. The majority found that the exact number of minors who are injured by this requirement is unimportant. However, the evidence does indicate that the cases where parental notification may not be in a minor's best interests are exceptional and of rare occurrence.[6] Plaintiffs' expert estimated that in her practice parental consultation is "objectively contraindicated"[7] only about 5 to 10 percent of the time. (Oct. 18, 1977, Tr. at p. 103; Deposition of Dr. Nadelson at I–41.) Another of plaintiffs' experts, commenting on how "extremely important" parental involvement is, noted that "there is the *rare*

case where it is impossible to obtain." (Dec. 7, 1974, Tr. at 67.) (Emphasis added.) The "usual situation" is that the minor's fears of telling her parents are not realized, and if the minor's fears were taken at face value and her parents not involved, she and her family would have lost the benefit of parental involvement. (Dec. 30, 1974, Tr. at 77, 123.) The majority in the case at bar assumed in their first opinion that most parents would seek to be supportive of their minor daughters. 393 F.Supp. 847, 853 (D.Mass.1975). The evidence shows that in the great majority of cases parental involvement will be in the minor's best interest. The statute should be "judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples." *Califano v. Jobst*, 434 U.S. 47, 55, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977). In this case, according to plaintiffs' own testimony, the typical, "run of the mill" situation is that a minor's fears about involving her parents are not realized. (Dec. 30, 1974, Tr. at 77.) Since in the majority of cases the statute will operate to protect minors from the consequences of decisions which they are not capable of making alone,[8] an imputation of unsupportive parental behavior in a concededly small number of cases[9] should not be

6. In their opinion the majority point out that the defendants concede that an appreciable number of parents are not supportive and that these include parents who would inflict physical harm, insist on an undesired marriage or continuance of pregnancy as punishment. This impression of parental behavior which the majority creates fails to note the limitation in the concession made by the defendants. Defendants stated that an "appreciable number" means only that such parents exist. The defendants made no admission as to the frequency of occurrence of this phenomenon. (Defendants' Responses to Plaintiffs' Requests for Admission, ¶ 7.)

7. "Objectively contraindicated" was used by the witness to mean that the witness, as a doctor, would agree that parental consultation is contraindicated. (Oct. 18, 1977, Tr. at 102.)

8. Plaintiffs admit that: the abortion decision-making process is the most difficult aspect of the experience for the girl (Plaintiffs' Responses to Defendants' Requests for Admissions, ¶ 67); an adolescent lacks experience with her

feelings and does not have the emotional control of an adult (*id.*, ¶ 53); ambivalence is especially prominent among adolescents (*id.*, ¶ 58); a period of intense anxiety and ambivalence is often experienced in the twenty-four hours prior to an abortion (*id.*, ¶ 57); a pregnant adolescent is "a child potentially bearing a child" (*id.*, ¶ 59); and the girl who makes her decision in collaboration with her parents seems the best prepared (*id.*, ¶ 67).

9. In note 5 of their opinion the majority reject the defendants' argument that in those exceptional cases where parental involvement may not be in the minor's best interests, an "as applied" proceeding would be the proper method to resolve the problem. In my view the defendants' argument is valid. This court would have jurisdiction over questions of the constitutional permissibility of specific applications of the statute and in "as applied" proceedings could determine whether the statutory requirement of parental involvement is constitutionally permissible. In such proceedings the court would have concrete facts before it and

held to outweigh the beneficial effects provided by the statute for the majority of minors.

The majority also express doubt of the "efficacy" of "last minute" parental consultation, reasoning that parents have many years to guide their children, and if communication has not been established before pregnancy, "last minute" consultation will not be beneficial. This reasoning is not persuasive. Does the majority perhaps attribute greater efficacy to a "last minute" consultation at an abortion facility, such as occurred in the case at bar? [10] Is it not far more likely that the pregnant adolescent would find more concerned guidance and care at the hands of her parents and the family physician? The majority fail to recognize the value of providing parents with the opportunity to consult with their minor children at the time that the children are faced with the necessity of making important decisions. They would appear to require that parents anticipate the variety of situations that may confront their children and prepare them in advance to deal with any problem that may arise during the course of the child's minority. However, a "last minute" opportunity may be the parents' only opportunity to offer guidance and assistance to their daughter on her abortion decision. Although good communication is established between parent and child, communication on the particular subject of abortion may not arise in the absence of an actual pregnancy experience. Even where parents have previously discussed their views on abortion with their children, the parents should not be denied the opportunity to counsel and assist their daughter in her real-life abortion problem if it actually arises. Communication at such time would be of the utmost importance. See *Doe v. Irwin*, 441 F.Supp. 1247, 1252–1253 (W.D. Mich.1977). The deep interest and concern that parents naturally have in the welfare of their children constitute a human resource of great value and its utilization should be encouraged. It is common sense to assume that many pregnant minors would be reluctant to confront their parents with their pregnancy. The majority have raised that reluctance to constitutional status by giving the minor the right to conceal her pregnancy from her parents. This ac-

---

the benefit of arguments of counsel to enable it to focus on the problem.

10. December 31, 1974, Testimony of Mary Moe I:

"Q. (by MR. LUCAS) When did you first contact Parents Aid Society?

"A. About five minutes after I found out I was pregnant.

"Q. And do you recall with whom you talked?

"A. To Marilyn.

"Q. About how long?

"A. About ten minutes.

"Q. Did you make an appointment at that time?

"A. Yes, I did.

"Q. Did she promise they would do an abortion on you at that time?

"A. Yes, she did.

"Q. Did she tell you you would have to have counseling first?

"A. She explained the whole thing to me on the phone. They also explained at the Women's Health Clinic. They had counseling and different things like that. She explained that I would go to counseling and they would perform the abortion, and it would take about five minutes, and I would go in the recovery room. She just briefly described it and when I came in, you know, they would go into more detail.

"Q. Did she tell you you would see a doctor at any time?

"A. Yes, Dr. Zupnick, who performed the abortion.

"Q. Did she indicate when you talked to her they would definitely perform the abortion?

"A. Yes, before November 1st.

"Q. Did she place any conditions on what she said? Did she indicate you had to meet with the doctor first, for example?

"A. No, she didn't.

"Q. Did they have any difficulty scheduling you before November 1st?

"A. Well, she told me right then they would schedule me but they weren't sure about the time and everything because they had to get it in before November 1st.

"Q. Was it difficult for you to come in as early as you did?

"A. I wanted it, yes, like for a week later, because it would have been more convenient." (Transcript at 137, 138)

On the procedure actually followed at the abortion facility of the plaintiffs in the case at bar, see also n. 8 of the dissenting opinion in *Baird v. Bellotti*, 393 F.Supp. 847, at pp. 859–860.

tion not only encourages concealment and deception within the family unit, but also wastes vast and valuable parental resources.

In addition to proving directly beneficial to the pregnant minor, the statute's requirement of parental notification also provides assistance to others who may have a role in the minor's abortion decision. In those cases where a superior court judge is asked to consent to a minor's abortion, parental participation in the judicial proceeding will make available to the judge information on the minor's medical, social and emotional background which would be important for him to know in arriving at reliable findings on the degree of the minor's maturity, and the reasonableness of her decision. The SJC has ruled that the statutory standard for a judicial order granting consent to a minor's abortion is the best interests of the minor. To carry out his role in determining the best interests of the minor, a judge must have knowledge of all the relevant circumstances in the minor's life. A minor's parents are the persons who normally have the most knowledge of the many aspects of their daughter's life and their input in a judicial proceeding may well supply the judge with valuable information in determining what is in the minor's best interests. Also, if counsel is appointed for the minor in the judicial proceeding, counsel's access to the minor's parents and the knowledge they have of her background may result in providing the minor with more effective representation.

A third reason advanced by the majority for striking down the entire statute is that the statute permits a superior court judge to override an "informed and reasonable decision to have an abortion" made by a pregnant minor whom the judge has found to be capable of making such a decision. I would hold the part of the statute which authorizes a judge to override the minor's decision in such a case constitutionally invalid. In *Roe v. Wade*, the Supreme Court held that a woman's constitutional right of privacy includes the right to decide whether or not to terminate her pregnancy. 410 U.S. 113, 153–154, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In *Planned Parenthood*, the Court extended this privacy right to minors and held that "the State may not impose a blanket provision . . . requiring the consent of a parent or person in loco parentis as a condition for abortion of an unmarried minor during the first 12 weeks of her pregnancy." 428 U.S. at 74, 96 S.Ct. at 2843. These two cases establish that the state does not have the constitutional authority to delegate to a judge the power to unconditionally prohibit a mature minor, capable of making an informed abortion decision, from terminating her pregnancy. Under the Constitution as construed in *Roe* and *Planned Parenthood*, the state itself lacks the power to interpose an unconditional veto to the abortion decision of a mature minor and her physician.

In *Planned Parenthood*, however, the Court further stated (at p. 75, 96 S.Ct. at p. 2844):

"We emphasize that our holding that § 3(4) [absolute requirement of parental consent] is invalid does not suggest that every minor, regardless of age or maturity, may give effective consent for termination of her pregnancy [citing *Bellotti v. Baird*, decided on the same day]. The fault with § 3(4) is that it imposes a special-consent provision, exercisable by a person other than the woman and her physician, as a prerequisite to a minor's termination of her pregnancy and does so without a sufficient justification for the restriction. . . ."

Mr. Justice Stewart, with whom Mr. Justice Powell joined, concurring with the Court, noted (at pp. 90–91, 96 S.Ct. at p. 2851):

"With respect to the state law's requirement of parental consent, § 3(4), I think it clear that its primary constitutional deficiency lies in its imposition of an absolute limitation on the minor's right to obtain an abortion. The Court's opinion today in *Bellotti v. Baird*, post, [428 U.S.] at 132, 147–148, 96 S.Ct. 2857, suggests that a materially different con-

stitutional issue would be presented under a provision requiring parental consent or consultation in most cases but providing for prompt (i) judicial resolution of any disagreement between the parent and the minor, or (ii) judicial determination that the minor is mature enough to give an informed consent without parental concurrence or that abortion in any event is in the minor's best interest. Such a provision would not impose parental approval as an absolute condition upon the minor's right but would assure in most instances consultation between the parent and child. (Footnote omitted.)

"There can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmarried pregnant minor to seek the help and advice of her parents in making the very important decision whether or not to bear a child. That is a grave decision, and a girl of tender years, under emotional stress, may be ill-equipped to make it without mature advice and emotional support. It seems unlikely that she will obtain adequate counsel and support from the attending physician at an abortion clinic, where abortions for pregnant minors frequently take place." (Footnote omitted.)

In note 1 on page 91, 96 S.Ct. 2831, Mr. Justice Stewart referred to the opinion of Mr. Justice Stevens (*id.*, pp. 102–105, 96 S.Ct. 2831) concurring in part and dissenting in part, for some of the considerations that support the State's interest in encouraging parental consent.

Under the SJC's construction of the statute, a judge may disregard a minor's informed and reasonable decision if he determines that an abortion is not in her best interests. 360 N.E.2d at p. 293. Under that interpretation, a minor's decision may be found to be both informed and reasonable and still not be in her best interests. I fail to see how a minor's decision found to be truly informed and reasonable can at the same time be found to be contrary to the minor's best interests. The provision vesting in the judge the power to override a minor's "informed and reasonable decision" because it is not in her best interest would appear to be self-contradictory and incapable of rational application. If the judge found the minor's decision not to be in her best interests, how could he consistently find it to be reasonable? The lack of any ascertainable principle to guide a judge in differentiating between concepts of what is a reasonable and informed course for the minor to take and what course is in the minor's best interests leaves the resolution of the problem to the arbitrary will of the judge. I would strike the provision for judicial override and would limit the judge's role to a determination of whether the minor is capable of making the decision and whether her decision to have an abortion is informed and reasonable.

However, a statute invalid in part is not necessarily void in its entirety. The provision in the statute allowing a judicial override of a mature minor's informed consent may be severed from the statute.[11] The Supreme Court has firmly rejected "a severability rule that required invalidation of an entire statute if any part of it was unconstitutionally overbroad, unless its different parts could be read as wholly independent provisions. . . . Consequently, we need not find . . . [a statute] constitutional in all its possible applications in order to uphold its facial constitutionality." *Griffin v. Breckenridge*, 403 U.S. 88, 104, 91 S.Ct. 1790, 1799, 29 L.Ed.2d 338 (1971). "The general rule on separability,

---

**11.** The majority define severability as "a process of striking out," n. 10, and under this definition, striking out the provision for judicial override constitutes a severance. However, as stated by Mr. Justice Cardozo, "Severance does not depend upon the separation of the good from the bad by paragraphs or sentences in the text of the enactment.' . . . The principle of division is not a principle of form. It is a principle of function." *People v. Knapp*, 230 N.Y. 48, 60, 129 N.E. 202, 207 (1920). Invalid applications, as well as invalid sentences or paragraphs, may be severed. *Loeb v. Columbia Township Trustees*, 179 U.S. 472, 490, 21 S.Ct. 174, 45 L.Ed. 280 (1900); *Griffin v. Breckenridge*, 403 U.S. 88, 104, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Doliner v. Town Clerk of Millis*, 343 Mass. 10, 15, 175 N.E.2d 925 (1961).

when part of a statute or some of its applications are declared to be constitutionally invalid is that the rest of the statute shall stand intact if the valid provisions or applications are capable of being given effect standing alone, and if the Legislature would have intended the statutes to stand with the invalid provisions stricken out." *Baird v. Davoren*, 346 F.Supp. 515, 522 (D.Mass.1972). See *Buckley v. Valeo*, 424 U.S. 1, 108, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); Opinion of the Justices, 330 Mass. 713, 726, 113 N.E.2d 452 (1953). The final authority on whether or not a state law should be construed as severable is the state court. *Dorchy v. Kansas*, 264 U.S. 286, 290, 44 S.Ct. 323, 68 L.Ed. 686 (1924); *Stevens v. Campbell*, 332 F.Supp. 102, 107 (D.Mass. 1971). The Massachusetts Supreme Judicial Court has stated that it is clear "the Legislature intended to pass an act which was constitutionally acceptable and, *even more important*, to save as much of the statute's purpose as it could if any explicit statutory provision could not survive constitutional attack. Statute 1974, c. 706, § 2, provides that '[i]f any section, subsection, sentence or clause of this act is held to be unconstitutional, such holding shall not affect the remaining portions of this act.'" 360 N.E.2d at 291. (Emphasis added.) The SJC's finding of legislative intent is binding on us. In view of the language used, it cannot seriously be doubted that the Legislature would have intended the statute to stand with the invalid provision stricken. It is the expressed intention of both the Legislature and the SJC that as much of

the statute as possible be saved. The invalidation of the entire statute would destroy a method of structuring the abortion decision designed to protect the very large and continuing class of pregnant minors.[12] By far the better course is to allow the law to operate where it can do so constitutionally, which, under the challenged statute, is in the great majority of the cases governed by it.

The severance of the judicial override will leave the essence of the statutory scheme intact. This is not an instance of judicial excision making the remainder of the statute difficult to interpret or apply. *Baird v. Eisenstadt*, 429 F.2d 1398, 1399 (1st Cir. 1970), aff'd on other grounds, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). The exclusion of the judicial override would leave the remainder of the statute entirely clear.

The majority also find that the statute constitutes a denial of equal protection in that it unreasonably distinguishes "between a minor and an adult, given a finding of maturity and informed consent." By striking the provision on judicial override, a minor who is found by a judge to be capable of a reasonable and informed consent will be treated as an adult and allowed to exercise her right to an abortion.

Plaintiffs contend that the statute denies equal protection in that it irrationally distinguishes between abortions and other medical procedures because the mature minor rule [13] and Mass.G.L. c. 112, § 12F,[14]

---

12. The value to a minor of parental involvement in her abortion decision-making is not disputed. (See Plaintiffs' Responses to Defendants' Requests for Admissions, ¶ 67; Defendants' Responses to Plaintiffs' Requests for Admissions, ¶ 6; Dec. 7, 1974, Tr. at 27, 67; Dec. 30, 1974, Tr. at 9, 48, 75, 77, 86, 119, 131; Dec. 31, 1974, Tr. at 24; Jan. 28, 1975, Tr. at 18, 33, 49, 50.)

13. "[W]here the best interests of a minor will be served by not notifying his or her parents of intended medical treatment and where the minor is capable of giving informed consent to that treatment, the mature minor rule applies in this Commonwealth." 360 N.E.2d at 296.

14. Mass.G.L. c. 112, § 12F: "No physician, dentist or hospital shall be held liable for damages for failure to obtain consent of a parent, legal guardian, or other person having custody or control of a minor child, or of the spouse of a patient, to emergency examination and treatment, including blood transfusions, when delay in treatment will endanger the life, limb, or mental well-being of the patient.

"Any minor may give consent to his medical or dental care at the time such care is sought if (i) he is married, widowed, divorced; or (ii) he is the parent of a child, in which case he may also give consent to medical or dental care of the child; or (iii) he is a member of any of the armed forces; or (iv) she is pregnant or believes herself to be pregnant; or (v) he is living

which allow certain minors to consent to medical procedures without parental involvement, are not applicable to abortions.[15] In *Bellotti v. Baird*, the Supreme Court stated: "As we hold today in Planned Parenthood, however, not all distinction[s] between abortion and other procedures is forbidden. . . . The constitutionality of such distinction will depend upon its degree and the justification for it." 428 U.S. at 149, 150, 96 S.Ct. at 2866.

The traditional rational basis test is to be used in testing any classifications made by the statute, since no suspect classification is involved, *Maher v. Roe*, 432 U.S. 464, 471, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), and a state need not establish a compelling interest for treating abortion differently from other medical procedures unless the state treatment is an unduly burdensome interference with a woman's freedom to decide whether or not to abort. *Id.*, at 473, 97 S.Ct. 2376. A state's interest in its minor citizens may be furthered by placing regulations on a minor's conduct which might be impermissible if imposed on an adult. *Ginsberg v. New York*, 390 U.S. 629, 638–639, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). Section 12S (formerly § 12P), by requiring parental involvement in a minor's abortion decision, helps the minor to arrive at a decision that is in her best interests and does not preclude or unduly burden the exercise of her privacy rights.[16]

separate and apart from his parent or legal guardian, and is managing his own financial affairs; or (vi) he reasonably believes himself to be suffering from or to have come in contact with any disease defined as dangerous to the public health pursuant to section six of chapter one hundred and eleven; provided, however, that such minor may only consent to care which relates to the diagnosis or treatment of such disease.

"Consent shall not be granted under subparagraphs (ii) through (vi), inclusive, for abortion or sterilization.

"Consent given under this section shall not be subject to later disaffirmance because of minority. The consent of the parent or legal guardian shall not be required to authorize such care and, notwithstanding any other provisions of law, such parent or legal guardian shall not be liable for the payment for any care rendered pursuant to this section unless such parent or legal guardian has expressly agreed to pay for such care.

"No physician or dentist, nor any hospital, clinic or infirmary shall be liable, civilly and criminally, for not obtaining the consent of the parent or legal guardian to render medical or dental care to a minor, if, at the time such care was rendered, such person or facility: (i) relied in good faith upon the representations of such minor that he is legally able to consent to such treatment under this section; or (ii) relied in good faith upon the representations of such minor that he is over eighteen years of age.

"All information and records kept in connection with the medical or dental care of a minor who consents thereto in accordance with this section shall be confidential between the minor and the physician or dentist, and shall not be released except upon the written consent of the minor or a proper judicial order. When the physician or dentist attending a minor reasonably believes the condition of said minor to be so serious that his life or limb is endangered, the physician or dentist shall notify the parents, legal guardian or foster parents of said condition and shall inform the minor of said notification."

15. "Our discussion of the mature minor rule as to operations generally has no application to non-emergency abortions because parental consultation, if possible, is mandated by statute." 360 N.E.2d at 297.

Mass.G.L. c. 112, § 12F: "Consent shall not be granted under subparagraphs (ii) through (vi), inclusive, for abortion or sterilization."

16. The Supreme Court has indicated that strict scrutiny is improper when reviewing statutes dealing with the privacy rights of minors and that state regulations inhibiting these rights are valid "if they serve 'any significant state interest . . . that is not present in the case of an adult.' " *Carey v. Population Services International*, 431 U.S. 678, 693, 97 S.Ct. 2010, 2021, 52 L.Ed.2d 675 (1977). "This test is apparently less rigorous than the 'compelling state interest' test applied to restrictions on the privacy rights of adults. . . . Such lesser scrutiny is appropriate both because of the States' greater latitude to regulate the conduct of children, *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), and because the right of privacy implicated here is 'the interest in independence in making certain kinds of important decisions,' *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), and the law has generally regarded minors as having a lesser capability for making important decisions. See, *e. g.*, *Planned Parenthood*, 428 U.S., at 102, 96 S.Ct. 2831. (STEVENS, J., concurring in part and dissenting in part)." *Id.* (431 U.S.) at n. 15, 97 S.Ct. at 2021.

Under the rational basis test the distinctions drawn by the statute must be rationally related to a constitutionally permissible purpose. *Maher v. Roe*, 432 U.S. at 478, 97 S.Ct. 2376. The Massachusetts statute, section 12P (now § 12S), clearly satisfies this standard. In fact, the state interests furthered by the statute greatly exceed this minimal level and are also sufficient to withstand a test of heightened scrutiny.

The Supreme Court has already found that abortion differs significantly from other medical procedures. "The simple answer to the argument that similar requirements are not imposed for other medical procedures is that such procedures do not involve the termination of a potential human life." [17] *Maher v. Roe*, 432 U.S. at 480, 97 S.Ct. at 2386. This fundamental difference between abortion and other medical procedures is sufficient to justify separate treatment for the abortion decision. The state's compelling concern for the welfare of its minor citizens creates an additional interest justifying the statute since the state's interest in protecting the health and welfare of its adolescents is certainly a constitutionally permissible one. The statute aims at ensuring that a minor understands and takes seriously the message of pregnancy.[18] In providing a structure to minimize the possibility of improvident decisions with serious consequences, the statute furthers the state's important interest in protecting its young citizens. It is clear that abortion has psychological and emotional consequences which are unique and that decisions to abort involve considerations that are not present in decisions to undergo other medical procedures. Where minors are involved, the problems in making a decision to abort are intensified. See note 8, *supra*. Thus, the fundamental difference between abortion and other medical procedures and the state's compelling concern for its minor citizens justify separate consent requirements for a minor's abortion decision.

Plaintiffs also argue that the statute irrationally discriminates between unmarried and married, widowed or divorced minors. The distinction between married (or formerly married) and unmarried minors is not irrational. Married minors have left their parents' families to create a new family with new responsibilities; they have become emancipated and their parents are no longer legally responsible for them. See *Califano v. Jobst, supra*, 434 at 47, 55, 98 S.Ct. 95. They have obtained parental consent to their marriage. Mass.G.L. c. 207, § 7. A married minor's decision to abort does not affect her parents and their responsibility to her in the same way as does an unmarried minor's decision to abort. The statute simply recognizes that marriage alters the relationship between a minor and her parents.

The Legislature has enacted a statute which is designed to aid a pregnant minor in making a reasoned decision whether or not to terminate her pregnancy.[19] The

---

17. A basic difference between abortion and other medical procedures was noted by plaintiffs' expert witness when she was asked to compare the psychological impact of an abortion with the impact of another medical procedure, such as a tonsillectomy. She testified that "they are really not comparable issues. . . . You are dealing with apples and oranges. They are not the same kind of thing. A tonsillectomy is a procedure that is done because you have something wrong . . . . You have been sick. An abortion is something where you are not sick . . . . a tonsillectomy is, basically, a non-controversial procedure which the doctor recommends and people generally go along with." (Deposition of Dr. Nadelson, I–30–33.)

18. The evidence shows a high rate of recidivism of unwanted teenage pregnancies. See

Plaintiffs' Responses to Defendants' Requests for Admissions, ¶ 37; Oct. 18, 1977, Trial Tr. at 95. Plaintiffs admit that "[f]or the adolescent, failure of resolution of the unwanted pregnancy crisis can potentially arrest development progress. The message of pregnancy must be understood and taken seriously if repetition is to be avoided." (Plaintiffs' Responses to Defendants' Requests for Admissions, ¶ 59; see also *id.*, ¶ 56.)

19. The majority express disapproval of the "chameleon-like" statute which the SJC has construed to "require as much parental consultation as is permissible constitutionally." 360 N.E.2d at 294. The majority demand greater precision from the Legislature than can be reasonably expected in this area of the law. The Supreme Court has not yet defined the permis-

statute logically selects the minor's parents as the appropriate persons to be given the opportunity in the first instance to guide their child, because they are the natural and legal guardians of the child. If the parents refuse consent, the state, through its courts, in its role of parens patriae, will be available to protect the minor's interests. With the severance of the provision for judicial override, where the minor has made an informed and reasonable decision, the judge will consent to her abortion. If she is found incapable of giving an informed consent, the judge will either grant or withhold consent depending on which course he finds on the evidence to be in the minor's best interests.

The importance of the parental role in the upbringing of children has been well established and repeatedly reaffirmed by the Supreme Court. *Myer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Wisconsin v. Yoder*, 406 U.S. 205, 232–233, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Smith v. Organization of Foster Families*, 431 U.S. 816, 843–844, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977); *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). Parental authority and the family unit have been constantly accorded constitutional protection because of legislative and judicial recognition that the family is fundamental in our society. *Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). *Moore v. East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). "Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural." *Id.*, at 503–504, 97 S.Ct. at 1938.

Parents have rights and responsibilities that inhere in the parent-child relationship and stem from the fact, nature and purpose of parenthood. These rights and responsibilities are not inimical to the minor's rights and welfare. They exist for the benefit of the child and reflect the child's very real need for proper guidance and protection during the child's formative years. The state has a compelling interest in protecting the parental rights and duties against unauthorized intrusion by third persons. The statute under attack expresses this compelling interest.

The parental right to control, subject to constitutional limitations, the upbringing of children is a natural counterpart to the parental duty to support, guide and protect the child. The occurrence of pregnancy in a minor does not absolve her parents of responsibility to support, protect and guide their daughter, nor does it eliminate the daughter's need for parental support, protection and guidance. To the contrary, it is a period when parental assistance is urgent.

The state has a compelling interest in protecting and furthering the health and welfare of its minors.[20] It has done so in

---

sible scope of parental involvement in an unmarried minor's decision to seek an abortion. In view of the Legislature's attempt to obtain maximum parental input within constitutional limits, the element of flexibility in the SJC's construction is reasonable. Insisting that the Legislature enact a statute that is perfect from its inception and striking down any attempt that does not meet this standard, while refusing to give the Legislature any clear guidance on what would be permissible, does not appear to afford a better solution.

**20.** See the opinions in *Danforth* which comment on the state interests which justify legislation in this area:

STEWART, J., with POWELL, J.:
"There can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmarried pregnant minor to seek the help and advice of her parents in making the very important decision whether or not to bear a child. That is a grave decision, and a girl of tender years, under emotional stress, may be ill-equipped to make it without mature advice and emotional support." 428 U.S. at 91, 96 S.Ct. at 2851.
WHITE, J., with BURGER and RHENQUIST, JJ.:
"The abortion decision is unquestionably important and has irrevocable consequences whichever way it is made. Missouri is entitled

this statute by protecting them from undue outside influences and hasty, unreasoned decisions on abortions. This is a permissible exercise of state power and the statute is therefore constitutional.

For the reasons stated in this and in my previous [21] dissenting opinion, I would uphold the constitutionality of the statute.

to protect the minor unmarried woman from making the decision in a way which is not in her own best interests." 428 U.S. at 95, 96 S.Ct. at 2853.

STEVENS, J.:

"The State's interest in protecting a young person from harm justifies the imposition of restraints on his or her freedom even though comparable restraints on adults would be constitutionally impermissible . . . [E]ven if it [the abortion decision] is the most important kind of a decision a young person may ever make, that assumption merely enhances the quality of the State's interest in maximizing the probability that the decision be made correctly and with full understanding of the consequences of either alternative." 428 U.S. at 102–103, 96 S.Ct. at 2856.

